## COPPAGE v. STATE OF KANSAS.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 48.  Submitted October 30, 1914.—Decided January 25, 1915.

The Kansas statute declaring it a misdemeanor punishable by fine or imprisonment for an employer to require an employé to agree not to become or remain a member of any labor organization during the time of the employment, so far as it applies to such a case as the present, where an employé at will, a man of full age and understanding, was merely required to freely choose whether he would give up his position of employment or would agree to refrain from association with the union while so employed, the case being free from any element of coercion or undue influence; *held*, repugnant to the "due process" clause of the Fourteenth Amendment.

*Adair* v. *United States*, 208 U. S. 161, followed to the effect that it is the constitutional right of an employer to dispense with the services of an employé because of his membership in a labor union, just as it is the constitutional right of an employé to quit the service of an employer who employs non-union men.

Under constitutional freedom of contract, whatever either party has the right to treat as sufficient ground for terminating the employment where there is no stipulation on the subject he has the right to provide against by insisting that a stipulation respecting it shall be à *sine qua non* of the inception of the employment, or of its continuance if terminable at will.

Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property, chief among which is that of personal employment by which labor and other services are exchanged for money or other forms of property.

A State cannot, by designating as "coercion" conduct which is not such in truth, render criminal any normal and essentially innocent exercise of personal liberty; for to permit this would deprive the Fourteenth Amendment of its effective force in this respect.

When a party appeals to this court for the protection of rights secured to him by the Federal Constitution, the decision is not to depend upon the form of the state law, nor even upon its declared purpose, but rather upon its operation and effect as applied and enforced by the State; and upon these matters this court cannot in the proper performance of its duty yield its judgment to that of the state court.

A statutory provision which is not a legitimate police regulation cannot be made such by being placed in the same act with a police regulation, or by being enacted under a title that declares a purpose which would be a proper object for the exercise of that power.

It being self-evident that, unless all things are held in common, some persons must have more property than others, it is from the nature of things impossible to uphold freedom of contract and the right of private property without at the same time recognizing as legitimate those inequalities of fortune that are the necessary result of the exercise of those rights.

The Fourteenth Amendment recognizes "liberty" and "property" as co-existent human rights and debars the States from any unwarranted interference with either.

Since a State may not strike down the rights of liberty or property directly, it may not do so indirectly, as by declaring in effect that the public good requires the removal of those inequalities that are but the normal and inevitable result of the exercise of those rights, and then invoking the police power in order to remove the inequalities, without other object in view.

The Fourteenth Amendment debars the States from striking down personal liberty or property rights or materially restricting their normal exercise, excepting so far as may be incidentally necessary for the accomplishment of some other and paramount object and one that concerns the public welfare. The mere restriction of liberty or of property rights cannot of itself be denominated "public welfare" and treated as a legitimate object of the police power; for such restriction is the very thing that is inhibited by the Amendment.

Without intimating anything inconsistent with the right of individuals to join labor unions, or questioning the legitimacy of such organizations so long as they conform to the laws of the land as others are required to do, *held,* that the individual has no inherent right to join a labor union and still remain in the employ of one who is unwilling to employ a union 'man any more than the same individual has a right to join the union without the consent of that organization.

There may not be one rule of liberty for the labor organization or its members and a different and more restrictive rule for employers.

The employé's liberty of making contracts does not include a liberty to procure employment from an unwilling employer or without a fair understanding. Nor may the employer be foreclosed by legislation from exercising the same freedom of choice that is accorded to the employé.

To ask a man to agree in advance to refrain from affiliation with the union while retaining a certain position of employment is not to ask him to give up any part of his constitutional freedom. He is free to decline the employment on those terms, just as the employer may decline to offer employment on any other; and, having accepted employment on those terms, the employé is still free to join the union when the period of employment expires, or, if employed at will, then at any time upon simply quitting the employment; and if bound by his own agreement to refrain from joining during a stated period of employment he is in no different situation from that which is necessarily incident to term contracts in general.

Constitutional freedom of contract does not mean that a party is to be as free after making a contract as before; he is not free to break it without accountability.

Freedom of contract, from the very nature of the thing, can be enjoyed only by being exercised; and each particular exercise of it involves making an engagement which if fulfilled prevents for the time any inconsistent course of conduct.

87 Kansas, 752, reversed.

THE facts, which involve the constitutionality under the due process clause of the Fourteenth Amendment of the statute of Kansas of 1909, making it unlawful for employers to coerce, require or influence employés not to join or remain members of labor organizations, are stated in the opinion.

*Mr. R. R. Vermilion* and *Mr. W. F. Evans* for plaintiff in error:

The statute amounts to deprivation of liberty and property without due process of law, and also to a denial of due process of law.

The statute is not a proper exercise of the police power.

In support of these contentions see, *Adair* v. *United States*, 208 U. S. 161; *A., T. & S. F. Ry.* v. *Brown,* 80 Kansas, 312; *Coffeyville Brick Co.* v. *Perry,* 69 Kansas, 297; *Gillespie* v. *People*, 188 Illinois, 176; *Goldfield Mines Co.* v. *Goldfield Miners' Union*, 159 Fed. Rep. 514; *Lochner* v. *New York*, 198 U. S. 45; *People* v. *Marcus*, 185 N. Y. 257; *State* v. *Coppage*, 87 Kansas, 752; *State* v. *Daniels,* 136 N. W. Rep. 584; *State* v. *Julow*, 129 Missouri, 163; *State* v. *Kreutzberg*, 114 Wisconsin, 530; *Cotting* v. *Kansas City Stock Yards*, 183 U. S. 112; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 558; *G., C. & S. F. Ry.* v. *Ellis*, 165 U. S. 151; *State* v. *Haun*, 61 Kansas, 154.

*Mr. John S. Dawson*, Attorney General of the State of Kansas, and *Mr. J. I. Sheppard* for defendant in error:

The Kansas statute does not violate the Fourteenth Amendment but seeks further to guarantee and protect the privileges and immunities of citizens of the United States. In harmony with the Fourteenth Amendment, the State of Kansas has said, in effect, that employers must not attempt to abridge the privilege of their employés to affiliate themselves with labor unions or meddle with or deprive them of their liberty to affiliate with such unions. They must not attempt by coercion to deprive them of their property—their financial interest in the insurance provided for their wives and children by such labor union. The State of Kansas will not fold its hands and sit idly by while employers seek to oppress and coerce their employés and reduce them to a state of peonage. Nor will the State withhold from a poor switchman equal protection

of its laws. See §§ 5508–10, Rev. Stat., prohibiting conspiracies to oppress any citizen of the United States.

If all men are to be equal within the law, as provided for in the Fourteenth Amendment; if the laboring man is to be the equal of the corporate officer; if the wage earner is to be the equal of his employer; if the poor man is to be the equal of the rich man; if that amendment is not to be distorted into a rod of oppression, then the law under which this prosecution was based is in furtherance of that amendment and not in derogation thereof.

In *Arthur* v. *Oakes*, 11 C. C. A. 209, 24 L. R. A. 414, Judge Harlan in his opinion held that as a general rule it is the right of every man to work for whom and when he pleases, and when he is ready to quit the service of his company he may do so. But this right of contract to quit work is not unlimited, but has its recognized exceptions. One of the exceptions to this rule, that the employé may quit the service of his employer when he likes, is, that employés cannot combine and conspire to quit the service of an employer, when the object and manifest intention is to injure the business of the employer.

The law of *Arthur* v. *Oakes* is the law of every State to-day, so it will be seen that this right to dispose of one's labor and capital as one pleases, relied upon by the plaintiff in error, is not without its recognized exceptions.

If the law in *Arthur* v. *Oakes*, there applied in favor of the corporation, is to be here applied in favor of the labor organization and its members, then the Kansas statute is constitutional. The only way to declare the law in the present case invalid is to say that in the eyes of the law the corporation is superior to the labor union, the poor man's organization. This is not the equality spoken of in the Fourteenth Amendment. *Coffeyville Brick Co.* v. *Perry*, 69 Kansas, 297, is no longer recognized as Kansas law and it can be distinguished.

There are differences between chapter 120 of the Laws

of Kansas of 1897, held unconstitutional in the *Perry Case*,
and chapter 222 of the Laws of Kansas of 1903, which is
herein questioned, to justify this court in upholding it;
while the law of 1897 was rightly held unconstitutional in
the *Perry Case*, the law here under review may be upheld
as valid because the two laws are substantially different.

Similar cases, such as *Doremus* v. *Hennessey*, 176 Illinois,
608; *State* v. *Julow*, 129 Missouri, 163; *Gillespie* v. *People*,
188 Illinois, 176; *Zillmer* v. *Kreutzberg*, 114 Wisconsin, 530;
*People* v. *Marcus*, 185 N. Y. 257; *Adair* v. *United States*,
208 U. S. 175; *Mines Company* v. *Miners' Union*, 159
Fed. Rep. 514, can be distinguished.

MR. JUSTICE PITNEY delivered the opinion of the court.

In a local court in one of the counties of Kansas, plain-
tiff in error was found guilty and adjudged to pay a fine,
with imprisonment as the alternative, upon an information
charging him with a violation of an act of the legislature
of that State, approved March 13, 1903, being Chap. 222
of the session laws of that year, found also as §§ 4674 and
4675, Gen. Stat. Kansas 1909. The act reads as follows:
"AN ACT to provide a penalty for coercing or influencing
  or making demands upon or requirements of employés,
  servants, laborers, and persons seeking employment.
"*Be it Enacted, etc.:*
  "SECTION 1. That it shall be unlawful for any individual
or member of any firm, or any agent, officer or employé
of any company or corporation, to coerce, require, demand
or influence any person or persons to enter into any agree-
ment, either written or verbal, not to join or become or
remain a member of any labor organization or association,
as a condition of such person or persons securing employ-
ment, or continuing in the employment of such individual,
firm, or corporation.
  "SEC. 2. Any individual or member of any firm or any

agent, officer or employé of any company or corporation violating the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than fifty dollars or imprisoned in the county jail not less than thirty days."

The judgment was affirmed by the Supreme Court of the State, two justices dissenting (87 Kansas, 752), and the case is brought here upon the ground that the statute, as construed and applied in this case, is in conflict with that provision of the Fourteenth Amendment of the Constitution of the United States which declares that no State shall deprive any person of liberty or property without due process of law.

The facts, as recited in the opinion of the Supreme Court, are as follows: About July 1, 1911, one Hedges was employed as a switchman by the St. Louis & San Francisco Railway Company, and was a member of a labor organization called the Switchmen's Union of North America. Plaintiff in error was employed by the railway company as superintendent, and as such he requested Hedges to sign an agreement, which he presented to him in writing, at the same time informing him that if he did not sign it he could not remain in the employ of the company. The following is a copy of the paper thus presented:

Fort Scott, Kansas, ―――― ―, 1911.
Mr. T. B. Coppage, Superintendent Frisco Lines, Fort Scott:

We, the undersigned, have agreed to abide by your request, that is, to withdraw from the Switchmen's Union, while in the service of the Frisco Company.
          (Signed)          ―――――――――――――

Hedges refused to sign this, and refused to withdraw from the labor organization. Thereupon plaintiff in error, as such superintendent, discharged him from the service of the company.

At the outset, a few words should be said respecting the construction of the act. It uses the term "coerce," and some stress is laid upon this in the opinion of the Kansas Supreme Court. But, on this record, we have nothing to do with any question of actual or implied coercion or duress, such as might overcome the will of the employé by means unlawful without the act. In the case before us, the state court treated the term "coerce" as applying to the mere insistence by the employer, or its agent, upon its right to prescribe terms upon which alone it would consent to a continuance of the relationship of employer and employé. In this sense we must understand the statute to have been construed by the court, for in this sense it was enforced in the present case; there being no finding, nor any evidence to support a finding, that plaintiff in error was guilty in any other sense. The entire evidence is included in the bill of exceptions returned with the writ of error, and we have examined it to the extent necessary in order to determine the Federal right that is asserted (*Southern Pacific Co.* v. *Schuyler,* 227 U. S. 601, 611, and cases cited). There is neither finding nor evidence that the contract of employment was other than a general or indefinite hiring, such as is presumed to be terminable at the will of either party. The evidence shows that it would have been to the advantage of Hedges, from a pecuniary point of view and otherwise, to have been permitted to retain his membership in the union, and at the same time to remain in the employ of the railway company. In particular, it shows (although no reference is made to this in the opinion of the court) that as a member of the union he was entitled to benefits in the nature of insurance to the amount of fifteen hundred dollars, which he would have been obliged to forego if he had ceased to be a member. But, aside from this matter of pecuniary interest, there is nothing to show that Hedges was subjected to the least pressure or influence, or that he was not

a free agent, in all respects competent, and at liberty to choose what was best from the standpoint of his own interests. Of course, if plaintiff in error, acting as the representative of the railway company, was otherwise within his legal rights in insisting that Hedges should elect whether to remain in the employ of the company or to retain his membership in the union, that insistence is not rendered unlawful by the fact that the choice involved a pecuniary sacrifice to Hedges. *Silliman* v. *United States,* 101 U. S. 465, 470, 471; *Hackley* v. *Headley,* 45 Michigan, 569, 576; *Emery* v. *Lowell,* 127 Massachusetts, 138, 141; *Custin* v. *City of Viroqua,* 67 Wisconsin, 314, 320. And if the right that plaintiff in error exercised is founded upon a constitutional basis it cannot be impaired by merely applying to its exercise the term "coercion." We have to deal, therefore, with a statute that, as construed and applied, makes it a criminal offense punishable with fine or imprisonment for an employer or his agent to merely prescribe, as a condition upon which one may secure certain employment or remain in such employment (the employment being terminable at will), that the employé shall enter into an agreement not to become or remain a member of any labor organization while so employed; the employé being subject to no incapacity or disability, but on the contrary free to exercise a voluntary choice.

In *Adair* v. *United States,* 208 U. S. 161, this court had to deal with a question not distinguishable in principle from the one now presented. Congress, in § 10 of an act of June 1, 1898, entitled "An Act concerning carriers engaged in interstate commerce and their employés" (c. 370, 30 Stat. 424, 428), had enacted "That any employer subject to the provisions of this Act and any officer, agent, or receiver of such employer who shall require any employé, or any person seeking employment, as a condition of such employment, to enter into an agreement, either written or verbal, not to become or remain a member

of any labor corporation, association, or organization; or shall threaten any employé with loss of employment, or shall unjustly discriminate against any employé because of his membership in such a labor corporation, association, or organization . . . is hereby declared to be guilty of a misdemeanor, and, upon conviction thereof . . . shall be punished for each offense by a fine of not less than one hundred dollars and not more than one thousand dollars." Adair was convicted upon an indictment charging that he, as agent of a common carrier subject to the provisions of the Act, unjustly discriminated against a certain employé by discharging him from the employ of the carrier because of his membership in a labor organization. The court held that portion of the Act upon which the conviction rested to be an invasion of the personal liberty as well as of the right of property guaranteed by the Fifth Amendment, which declares that no person shall be deprived of liberty or property without due process of law. Speaking by Mr. Justice Harlan, the court said (208 U. S., p. 174): "While, as already suggested, the right of liberty and property guaranteed by the Constitution against deprivation without due process of law, is subject to such reasonable restraints as the common good or the general welfare may require, it is not within the functions of government—at least in the absence of contract between the parties—to compel any person in the course of his business and against his will to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. So the right of the employé to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such

employé. It was the legal right of the defendant Adair—however unwise such a course might have been—to discharge Coppage [the employé in that case] because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so—however unwise such a course on his part might have been—to quit the service in which he was engaged, because the defendant employed some persons who were not members of a labor organization. In all such particulars the employer and the employé have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land."

Unless it is to be overruled, this decision is controlling upon the present controversy; for if Congress is prevented from arbitra. r interference with the liberty of contract because of the "due process" provision of the Fifth Amendment, it is too clear for argument that the States are prevented from the like interference by virtue of the corresponding clause of the Fourteenth Amendment; and hence if it be unconstitutional for Congress to deprive an employer of liberty or property for threatening an employé with loss of employment or discriminating against him because of his membership in a labor organization, it is unconstitutional for a State to similarly punish an employer for requiring his employé, as a condition of securing or retaining employment, to agree not to become or remain a member of such an organization while so employed.

It is true that, while the statute that was dealt with in the *Adair Case* contained a clause substantially identical with the Kansas act now under consideration—a clause making it a misdemeanor for an employer to require an employé or applicant for employment, as a condition of such employment, to agree not to become or remain a member of a labor organization,—the conviction was

based upon another clause, which related to discharging
an employé because of his membership in such an organiza-
tion; and the decision, naturally, was confined to the case
actually presented for decision. In the present case, the
Kansas Supreme Court sought to distinguish the *Adair*
decision upon this ground. The distinction, if any there
be, has not previously been recognized as substantial, so
far as we have been able to find. The opinion in the *Adair
Case*, while carefully restricting the decision to the precise
matter involved, cited (208 U. S. on page 175), as the first
in order of a number of decisions supporting the conclusion
of the court, a case (*People* v. *Marcus*, 185 N. Y. 257), in
which the statute denounced as unconstitutional was in
substance the counterpart of the one with which we are
now dealing.

But, irrespective of whether it has received judicial
recognition, is there any real distinction? The constitu-
tional right of the employer to discharge an employé be-
cause of his membership in a labor union being granted,
can the employer be compelled to resort to this extreme
measure? May he not offer to the employé an option,
such as was offered in the instant case, to remain in the
employment if he will retire from the union; to sever the
former relationship only if he prefers the latter? Granted
the equal freedom of both parties to the contract of em-
ployment, has not each party the right to stipulate upon
what terms only he will consent to the inception, or to the
continuance, of that relationship? And may he not in-
sist upon an express agreement, instead of leaving the
terms of the employment to be implied? Can the legisla-
ture in effect require either party at the beginning to act
covertly; concealing essential terms of the employment—
terms to which, perhaps, the other would not willingly
consent—and revealing them only when it is proposed to
insist upon them as a ground for terminating the relation-
ship? Supposing an employer is unwilling to have in his

employ one holding membership in a labor union,. and has reason to suppose that the man may prefer membership in the union to the given employment without it—we ask, can the legislature oblige the employer in such case to refrain from dealing frankly at the outset? And is not the employer entitled to insist upon equal frankness in return? Approaching the matter from a somewhat different standpoint, is the employé's right to be free to join a labor union any more sacred, or more securely founded upon the Constitution, than his right to work for whom he will, or to be idle if he will? And does not the ordinary contract of employment include an insistence by the employer that the employé shall agree, as a condition of the employment, that he will not be idle and will not work for whom he pleases but will serve his present employer, and him only, so long as the relation between them shall continue? Can the right of making contracts be enjoyed at all, except by parties coming together in an agreement that requires each party to forego, during the time and for the purpose covered by the agreement, any inconsistent exercise of his constitutional rights?

These queries answer themselves. The answers, as we think, lead to a single conclusion: Under constitutional freedom of contract, whatever either party has the right to treat as sufficient ground for terminating the employment, where there is no stipulation on the subject, he has the right to provide against by insisting that a stipulation respecting it shall be a *sine qua non* of the inception of the employment, or of its continuance if it be terminable at will. It follows that this case cannot be distinguished from *Adair* v. *United States.*

The decision in that case was reached as the result of elaborate argument and full consideration. The opinion states. (208 U. S. 171): "This question is admittedly one of importance, and has been examined with care and deliberation. And the court has reached a conclusion

which, in its judgment, is consistent with both the words and spirit of the Constitution and is sustained as well by sound reason." We are now asked, in effect, to over-rule it; and in view of the importance of the issue we have re-examined the question from the standpoint of both reason and authority. As a result, we are constrained to re-affirm the doctrine there applied. Neither the doctrine nor this application of it is novel; we will endeavor to re-state some of the grounds upon which it rests. The principle is fundamental and vital. Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money.

An interference with this liberty so serious as that now under consideration, and so disturbing of equality of right, must be deemed to be arbitrary, unless it be supportable as a reasonable exercise of the police power of the State. But, notwithstanding the strong general presumption in favor of the validity of state laws, we do not think the statute in question, as construed and applied in this case, can be sustained as a legitimate exercise of that power. To avoid possible misunderstanding, we should here emphasize, what has been said before, that so far as its title or enacting clause expresses a purpose to deal with coercion, compulsion, duress, or other undue influence, we have no present concern with it, because nothing of that sort is involved in this case. As has

been many times stated, this court deals not with moot cases or abstract questions, but with the concrete case before it. (*California* v. *San Pablo &c. Railroad,* 149 U. S. 308, 314; *Richardson* v. *McChesney,* 218 U. S. 487, 492; *Missouri, Kan. & Texas Ry.* v. *Cade,* 233 U. S. 642, 648.) We do not mean to say, therefore, that a State may not properly exert its police power to prevent coercion on the part of employers towards employés, or *vice versa.* But, in this case, the Kansas court of last resort has held that Coppage, the plaintiff in error, is a criminal punishable with fine or imprisonment under this statute simply and merely because, while acting as the representative of the Railroad Company and dealing with Hedges, an employé at will and a man of full age and understanding, subject to no restraint or disability, Coppage insisted that Hedges should freely choose whether he would leave the employ of the Company or would agree to refrain from association with the union while so employed. This construction is, for all purposes of our jurisdiction, conclusive evidence that the State of Kansas intends by this legislation to punish conduct such as that of Coppage, although entirely devoid of any element of coercion, compulsion, duress, or undue influence, just as certainly as it intends to punish coercion and the like. But, when a party appeals to this court for the protection of rights secured to him by the Federal Constitution, the decision is not to depend upon the form of the state law, nor even upon its declared purpose, but rather upon its operation and effect as applied and enforced by the State; and upon these matters this court cannot, in the proper performance of its duty, yield its judgment to that of the state court. *St. Louis S. W. Ry.* v. *Arkansas,* 235 U. S. 350, 362, and cases cited. Now, it seems to us clear that a statutory provision which is not a legitimate police regulation cannot be made such by being placed in the same act with a police regulation, or by being enacted under a title that declares a

purpose which would be a proper object for the exercise
of that power. "Its true character cannot be changed by
its collocation," as Mr. Justice Grier said in the *Passenger
Cases*, 7 How. 283, 458. It is equally clear, we think,
that to punish an employer or his agent for simply pro-
posing certain terms of employment, under circumstances
devoid of coercion, duress, or undue influence, has no
reasonable relation to a declared purpose of repressing
coercion, duress, and undue influence. Nor can a State,
by designating as "coercion" conduct which is not such in
truth, render criminal any normal and essentially innocent
exercise of personal liberty or of property rights; for to
permit this would deprive the Fourteenth Amendment
of its effective force in this regard. We of course do
not intend to attribute to the legislature or the courts
of Kansas any improper purpose or any want of candor;
but only to emphasize the distinction between the form
of the statute and its effect as applied to the present
case.

Laying aside, therefore, as immaterial for present pur-
poses, so much of the statute as indicates a purpose to
repress coercive practices, what possible relation has the
residue of the Act to the public health, safety, morals or
general welfare? None is suggested, and we are unable to
conceive of any. The Act, as the construction given to
it by the state court shows, is intended to deprive employ-
ers of a part of their liberty of contract, to the correspond-
ing advantage of the employed and the upbuilding of the
labor organizations. But no attempt is made, or could
reasonably be made, to sustain the purpose to strengthen
these voluntary organizations, any more than other vol-
untary associations of persons, as a legitimate object for
the exercise of the police power. They are not public
institutions, charged by law with public or governmental
duties, such as would render the maintenance of their
membership a matter of direct concern to the general

welfare. If they were, a different question would be presented.

As to the interest of the employed, it is said by the Kansas Supreme Court (87 Kansas, p. 759) to be a matter of common knowledge that "employés, as a rule, are not financially able to be as independent in making contracts for the sale of their labor as are employers in making contracts of purchase thereof." No doubt, wherever the right of private property exists, there must and will be inequalities of fortune; and thus it naturally happens that parties negotiating about a contract are not equally unhampered by circumstances. This applies to all contracts, and not merely to that between employer and employé. Indeed a little reflection will show that wherever the right of private property and the right of free contract co-exist, each party when contracting is inevitably more or less influenced by the question whether he has much property, or little, or none; for the contract is made to the very end that each may gain something that he needs or desires more urgently than that which he proposes to give in exchange. And, since it is self-evident that, unless all things are held in common, some persons must have more property than others, it is from the nature of things impossible to uphold freedom of contract and the right of private property without at the same time recognizing as legitimate those inequalities of fortune that are the necessary result of the exercise of those rights. But the Fourteenth Amendment, in declaring that a State shall not "deprive any person of life, liberty or property without due process of law," gives to each of these an equal sanction; it recognizes "liberty" and "property" as co-existent human rights, and debars the States from any unwarranted interference with either.

And since a State may not strike them down directly it is clear that it may not do so indirectly, as by declaring in effect that the public good requires the removal of those

inequalities that are but the normal and inevitable result of their exercise, and then invoking the police power in order to remove the inequalities, without other object in view. The police power is broad, and not easily defined, but it cannot be given the wide scope that is here asserted for it, without in effect nullifying the constitutional guaranty.

We need not refer to the numerous and familiar cases in which this court has held that the power may properly be exercised for preserving the public health, safety, morals, or general welfare, and that such police regulations may reasonably limit the enjoyment of personal liberty, including the right of making contracts. They are reviewed in *Holden* v. *Hardy*, 169 U. S. 366, 391; *Chicago, B. & Quincy R. R.* v. *McGuire*, 219 U. S. 549, 566; *Erie R. R.* v. *Williams*, 233 U. S. 685; and other recent decisions. An evident and controlling distinction is this: that in those cases it has been held permissible for the States to adopt regulations fairly deemed necessary to secure some object directly affecting the public welfare, even though the enjoyment of private rights of liberty and property be thereby incidentally hampered; while in that portion of the Kansas statute which is now under consideration—that is to say, aside from coercion, etc.—there is no object or purpose, expressed or implied, that is claimed to have reference to health, safety, morals, or public welfare, beyond the supposed desirability of leveling inequalities of fortune by depriving one who has property of some part of what is characterized as his "financial independence." In short, an interference with the normal exercise of personal liberty and property rights is the primary object of the statute, and not an incident to the advancement of the general welfare. But, in our opinion, the Fourteenth Amendment debars the States from striking down personal liberty or property rights, or materially restricting their normal exercise, excepting

so far as may be incidentally necessary for the accomplishment of some other and paramount object, and one that concerns the public welfare. The mere restriction of liberty or of property rights cannot of itself be denominated "public welfare," and treated as a legitimate object of the police power; for such restriction is the very thing that is inhibited by the Amendment.

It is said in the opinion of the state court that membership in a labor organization does not necessarily affect a man's duty to his employer; that the employer has no right, by virtue of the relation, "to dominate the life nor to interfere with the liberty of the employé in matters that do not lessen or deteriorate the service"; and that "the statute implies that labor unions are lawful and not inimical to the rights of employers." The same view is presented in the brief of counsel for the State, where it is said that membership in a labor organization is the "personal and private affair" of the employé. To this line of argument it is sufficient to say that it cannot be judicially declared that membership in such an organization has no relation to a member's duty to his employer; and therefore, if freedom of contract is to be preserved, the employer must be left at liberty to decide for himself whether such membership by his employé is consistent with the satisfactory performance of the duties of the employment.

Of course we do not intend to say, nor to intimate, anything inconsistent with the right of individuals to join labor unions, nor do we question the legitimacy of such organizations so long as they conform to the laws of the land as others are required to do. Conceding the full right of the individual to join the union, he has no inherent right to do this and still remain in the employ of one who is unwilling to employ a union man, any more than the same individual has a right to join the union without the consent of that organization. Can it be doubted that a

labor organization—a voluntary association of working
men—has the inherent and constitutional right to deny
membership to any man who will not agree that during
such membership he will not accept or retain employment
in company with non-union men?   Or that a union man
has the constitutional right to decline proffered employ-
ment unless the employer will agree not to employ any
non-union man?   (In all cases we refer, of course, to agree-
ments made voluntarily, and without coercion or duress
as between the parties.   And we have no reference to ques-
tions of monopoly, or interference with the rights of third
parties' or the general public.   These involve other con-
siderations, respecting which we intend to intimate no
opinion.   See *Curran* v. *Galen*, 152 N. Y. 33; 46 N. E. Rep.
297; *Jacobs* v. *Cohen*, 183 N. Y. 207, 213, 214; 76 N. E.
Rep. 5; *Plant* v. *Woods*, 176 Massachusetts, 492; 57 N. E.
Rep. 1011; *Berry* v. *Donovan*, 188 Massachusetts, 353; 74
N. E. Rep. 603; 3 A. & E. Ann. Cas. 738; *Brennan* v.
*United Hatters*, 73 N. J. Law, 729, 738; 65 Atl. Rep. 165,
169; 9 A. & E. Ann. Cas. 698, 702.)   And can there be one
rule of liberty for the labor organization and its members,
and a different and more restrictive rule for employers?
We think not; and since the relation of employer and em-
ployé is a voluntary relation, as clearly as is that between
the members of a labor organization, the employer has
the same inherent right to prescribe the terms upon which
he will consent to the relationship, and to have them fairly
understood and expressed in advance.

When a man is called upon to agree not to become or
remain a member of the union while working for a particu-
lar employer, he is in effect only asked to deal openly and
frankly with his employer, so as not to retain the employ-
ment upon terms to which the latter is not willing to agree.
And the liberty of making contracts does not include a
liberty to procure employment from an unwilling em-
ployer, or without a fair understanding.   Nor may the

employer be foreclosed by legislation from exercising the same freedom of choice that is the right of the employé.

To ask a man to agree, in advance, to refrain from affiliation with the union while retaining a certain position of employment, is not to ask him to give up any part of his constitutional freedom. He is free to decline the employment on those terms, just as the employer may decline to offer employment on any other; for "It takes two to make a bargain." Having accepted employment on those terms, the man is still free to join the union when the period of employment expires; or, if employed at will, then at any time upon simply quitting the employment. And, if bound by his own agreement to refrain from joining during a stated period of employment, he is in no different situation from that which is necessarily incident to term contracts in general. For constitutional freedom of contract does not mean that a party is to be as free after making a contract as before; he is not free to break it without accountability. Freedom of contract, from the very nature of the thing, can be enjoyed only by being exercised; and each particular exercise of it involves making an engagement which, if fulfilled, prevents for the time any inconsistent course of conduct.

So much for the reason of the matter; let us turn again to the adjudicated cases.

The decision in the *Adair Case* is in accord with the almost unbroken current of authorities in the state courts. In many States enactments not distinguishable in principle from the one now in question have been passed, but, except in two instances (one, the decision of an inferior court in Ohio, since repudiated; the other, the decision now under review), we are unable to find that they have been judicially enforced. It is not too much to say that such laws have by common consent been treated as unconstitutional, for while many state courts of last resort have adjudged them void, we have found no decision by such a court

sustaining legislation of this character, excepting that
which is now under review. The single previous instance
in which any court has upheld such a statute is *Davis* v.
*State of Ohio* (1893), 30 Cinc. Law Bull. 342; 11 Ohio Dec.
Reprint, 894; where the Court of Common Pleas of Ham-
ilton County sustained an act of April 14, 1892 (89 Ohio
Laws, 269), which declared that any person who coerced or
attempted to coerce employés by discharging or threaten-
ing to discharge them because of their connection with any
lawful labor organization should be guilty of a misde-
meanor and upon conviction fined or imprisoned. We
are unable to find that this decision was ever directly re-
viewed; but in *State of Ohio* v. *Bateman* (1900), 10 Ohio
Dec. 68; 7 Ohio N. P. 487, its authority was repudiated
upon the ground that it had been in effect overruled by
subsequent decisions of the state Supreme Court, and the
same statute was held unconstitutional.

The right that plaintiff in error is now seeking to main-
tain was held by the Supreme Court of Kansas, in an
earlier case, to be within the protection of the Fourteenth
Amendment and therefore beyond legislative interference.
In *Coffeyville Brick Co.* v. *Perry*, 69 Kansas, 297; 76 Pac.
Rep. 848; 66 L. R. A. 185; 1 A. & E. Ann. Cas. 936; the
court had under consideration Ch. 120 of the Laws of 1897
(Gen. Stat. 1901, §§ 2425, 2426), which declared it unlaw-
ful for any person, company, or corporation, or agent,
officer, etc., to prevent employés from joining and belong-
ing to any labor organization, and enacted that any such
person, company, or corporation, etc., that coerced or
attempted to coerce employés by discharging or threaten-
ing to discharge them because of their connection with
such labor organization should be deemed guilty of a
misdemeanor, and upon conviction subjected to a fine,
and should also be liable to the person injured in punitive
damages. It was attacked as violative of the Fourteenth
Amendment, and also of the Bill of Rights of the state

constitution.[1]  The court held it unconstitutional, saying (p. 299): "The right to follow any lawful vocation and to make contracts is as completely within the protection of the constitution as the right to hold property free from unwarranted seizure, or the liberty to go when and where one will.  One of the ways of obtaining property is by contract.  The right, therefore, to contract cannot be infringed by the legislature without violating the letter and spirit of the constitution.  Every citizen is protected in his right to work where and for whom he will.  He may select not only his employer but also his associates.  He is at liberty to refuse to continue to serve one who has in his employ a person, or an association of persons, objectionable to him.  In this respect the rights of the employer and employé are equal.  Any act of the legislature that would undertake to impose on an employer the obligation of keeping in his service one whom, for any reason, he should not desire would be a denial of his constitutional right to make and terminate contracts and to acquire and hold property.  Equally so would be an act the provisions of which should be intended to require one to remain in the service of one whom he should not desire to serve. . . . The business conducted by the defendant was its property, and in the exercise of this ownership it is protected by the constitution.  It could abandon or discontinue its operation at pleasure.  It had the right, beyond the possibility of legislative interference, to make any contract with reference thereto not in violation of law.

---

[1] Constitution of the State of Kansas. . . . Bill of Rights.

Section 1. All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.

\*        \*        \*        \*        \*        \*        \*        \*

Section 18. All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay.

In the operation of its property it may employ such persons as are desirable, and discharge, without reason, those who are undesirable. It is at liberty to contract for the services of persons in any manner that is satisfactory to both. No legislative restrictions can be imposed upon the lawful exercise of these rights."

In *Railway Co.* v. *Brown,* 80 Kansas, 312; 102 Pac. Rep. 459, the same court passed upon Chapter 144 of the Laws of 1897 (Gen. Stat. 1901, §§ 2421–2424), which required the employer upon the request of a discharged employé to furnish in writing the true cause or reason for such discharge. The railway company did not meet this requirement, its "service letter," as it was called, stating only that Brown was discharged "for cause," which the court naturally held was not a statement of the cause. The law was held unconstitutional, upon the ground (80 Kansas, 315) that an employer may discharge his employé for any reason, or for no reason, just as an employé may quit the employment for any reason, or for no reason; that such action on the part of employer or employé, where no obligation is violated, is an essential element of liberty in action; and that one cannot be compelled to give a reason or cause for an action for which he may have no specific reason or cause, except, perhaps, a mere whim or prejudice.

In the present case the court did not repudiate or overrule these previous decisions, but on the contrary cited them as establishing the right of the employer to discharge his employé at any time, for any reason, or for no reason, being responsible in damages for violating a contract as to the time of employment, and as establishing, conversely, the right of the employé to quit the employment at any time, for any reason, or without any reason, being likewise responsible in damages for a violation of his contract with the employer. The court held the act of 1903 that is now in question to be distinguishable from the

act of 1897, upon grounds sufficiently indicated and answered by what we have already said.

In five other States the courts of last resort have had similar acts under consideration, and in each instance have held them unconstitutional. In *State* v. *Julow* (1895), 129 Missouri, 163; 31 S. W. Rep. 781; 29 L. R. A. 257; 50 Am. St. Rep. 443; the Supreme Court of Missouri dealt with an act (Missouri Laws 1893, p. 187), that forbade employers, on pain of fine or imprisonment, to enter into any agreement with an employé requiring him to withdraw from a labor union or other lawful organization, or to refrain from joining such an organization, or to "by any means attempt to compel or coerce any employé into withdrawal from any lawful organization or society." In *Gillespie* v. *The People* (1900), 188 Illinois, 176; 58 N. E. Rep. 1007; 52 L. R. A. 283; 80 Am. St. Rep. 176; the Supreme Court of Illinois held unconstitutional an act (Hurd's Stat. 1899, p. 844) declaring it criminal for any individual or member of any firm, etc., to prevent or attempt to prevent employés from forming, joining, and belonging to any lawful labor organization, and that any such person "that coerces or attempts to coerce employés by discharging or threatening to discharge them because of their connection with such lawful labor organization" should be guilty of a misdemeanor. In *State, ex rel. Zillmer* v. *Kreutzberg* (1902), 114 Wisconsin, 530; 90 N. W. Rep. 1098; 58 L. R. A. 748; 91 Am. St. Rep. 934; the court had under consideration a statute (Wisconsin Laws 1899, ch. 332), which, like the Kansas act now in question, prohibited the employer or his agent from coercing the employé to enter into an agreement not to become a member of a labor organization, as a condition of securing employment or continuing in the employment, and also rendered it unlawful to discharge an employé because of his being a member of any labor organization. The decision related to the latter prohibition, but this was denounced

upon able and learned reasoning that has a much wider reach. In *People* v. *Marcus* (1906), 185 N. Y. 257; 77 N. E. Rep. 1073; 7 L. R. A., N. S. 282; 113 Am. St. Rep. 902; 7 A. & E. Ann. Cas. 118; the statute dealt with (N. Y. Laws, 1887, ch. 688), as we have already said, was in substance identical with the Kansas act. These decisions antedated *Adair* v. *United States.* They proceed upon broad and fundamental reasoning, the same in substance that was adopted by this court in the *Adair Case*, and they are cited with approval in the opinion (208 U. S. 175). A like result was reached in *State, ex rel. Smith* v. *Daniels* (1912), 118 Minnesota, 155; 136 N. W. Rep. 584; with respect to an act that, like the Kansas statute, forbade an employer to require an employé or person seeking employment, as a condition of such employment, to make an agreement that the employé would not become or remain a member of a labor organization. This was held invalid upon the authority of the *Adair Case.* And see *Goldfield Mines Co.* v. *Goldfield Miners' Union*, 159 Fed. Rep. 500, 513.

Upon both principle and authority, therefore, we are constrained to hold that the Kansas act of March 13, 1903, as construed and applied so as to punish with fine or imprisonment an employer or his agent for merely prescribing, as a condition upon which one may secure employment under or remain in the service of such employer, that the employé shall enter into an agreement not to become or remain a member of any labor organization while so employed, is repugnant to the "due process" clause of the Fourteenth Amendment, and therefore void.

*Judgment reversed, and the cause remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE HOLMES, dissenting.

I think the judgment should be affirmed. In present conditions a workman not unnaturally may believe that

only by belonging to a union can he secure a contract that shall be fair to him.  *Holden* v. *Hardy,* 169 U. S. 366, 397. *Chicago, Burlington & Quincy R. R.* v. *McGuire,* 219 U. S. 549, 570.  If that belief, whether right or wrong, may be held by a reasonable man, it seems to me that it may be enforced by law in order to establish the equality of position between the parties in which liberty of contract begins. Whether in the long run it is wise for the workingmen to enact legislation of this sort is not my concern, but I am strongly of opinion that there is nothing in the Constitution of the United States to prevent it, and that *Adair* v. *United States,* 208 U. S. 161, and *Lochner* v. *New York,* 198 U. S. 45, should be overruled.  I have stated my grounds in those cases and think it unnecessary to add others that I think exist.  See further *Vegelahn* v. *Guntner,* 167 Massachusetts, 92, 104, 108.  *Plant* v. *Woods,* 176 Massachusetts, 492, 505.  I still entertain the opinions expressed by me in Massachusetts.

MR. JUSTICE DAY with whom MR. JUSTICE HUGHES concurs, dissenting:

The character of the question here involved sufficiently justifies, in my opinion, a statement of the grounds which impel me to dissent from the opinion and judgment in this case.  The importance of the decision is further emphasized by the fact that it results not only in invalidating the legislation of Kansas, now before the court, but necessarily decrees the same fate to like legislation of other States of the Union.[1]  This far-reaching result is attained because the statute is declared to be an infraction

[1] Statutes like the Kansas statute have been passed in California, Colorado, Connecticut, Indiana, Massachusetts, Minnesota, New Hampshire, New Jersey, New York, Oklahoma, Oregon, Pennsylvania, Porto Rico, and Wisconsin.  Bulletin of the Bureau of Labor Statistics No. 148, Volumes 1 and 2; Labor Laws of the United States.

of the constitutional protection afforded under the Fourteenth Amendment to the Federal Constitution, which declares that no person shall be deprived of life, liberty or property without due process of law. The right of contract, it is said, is part of the liberty of the citizen, and to abridge it, as is done in this case, is declared to be beyond the legislative authority of the State.

That the right of contract is a part of individual freedom within the protection of this amendment, and may not be arbitrarily interfered with, is conceded. While this is true, nothing is better settled by the repeated decisions of this court than that the right of contract is not absolute and unyielding, but is subject to limitation and restraint in the interest of the public health, safety and welfare, and such limitations may be declared in legislation of the State. It would unduly extend what I purpose to say in this case to refer to all the cases in which this doctrine has been declared. One of them is: *Frisbie* v. *United States*, 157 U. S. 160, 165. In that case, it was declared, and in varying form has been repeated many times since:

"While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence, and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally

speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

See also *Holden* v. *Hardy*, 169 U. S. 366, 391; *Atkin* v. *Kansas*, 191 U. S. 207; *Muller* v. *Oregon*, 208 U. S. 412, 421; *McLean* v. *Arkansas*, 211 U. S. 539; *Chicago, Burlington & Quincy R. R.* v. *McGuire*, 219 U. S. 549; *Atlantic Coast Line* v. *Riverside Mills*, 219 U. S. 186, 202; *Erie Railroad* v. *Williams*, 233 U. S. 685, 699. The *Erie Railroad Case* is a very recent deliverance of this court upon the subject, wherein it was declared:

. "But liberty of making contracts is subject to conditions in the interest of the public welfare, and which shall prevail—principle or condition—cannot be defined by any precise and universal formula. Each instance of asserted conflict must be determined by itself, and it has been said many times that each act of legislation has the support of the presumption that it is an exercise in the interest of the public. The burden is on him who attacks the legislation, and it is not sustained by declaring a liberty of contract. It can only be sustained by demonstrating that it conflicts with some constitutional restraint or that the public welfare is not subserved by the legislation. The legislature is, in the first instance, the judge of what is necessary for the public welfare, and a judicial review of its judgment is limited. The earnest conflict of serious opinion does not suffice to bring it within the range of judicial cognizance. *C., B. & Q. R. R. Co.* v. *McGuire*, 219 U. S. 549, 565; *German Alliance Insurance Co.* v. *Kansas*, 233 U. S. 389."

It is therefore the thoroughly established doctrine of this court that liberty of contract may be circumscribed in the interest of the State and the welfare of its people. Whether a given exercise of such authority transcends the limits of legislative authority must be determined in each case as it arises. The preservation of the police power of the States, under the authority of which that

great mass of legislation has been enacted which has for its purpose the promotion of the health, safety and welfare of the public, is of the utmost importance. This power was not surrendered by the States when the Federal Constitution was adopted, nor taken from them when the Fourteenth Amendment was ratified and became a part of the fundamental law of the Union. *Barbier* v. *Connolly*, 113 U. S. 27.

Of the necessity of such legislation, the local legislature is itself the judge, and its enactments are only to be set aside when they involve such palpable abuse of power and lack of reasonableness to accomplish a lawful end that they may be said to be merely arbitrary and capricious, and hence out of place in a government of laws and not of men, and irreconcilable with the conception of due process of law. McGehee on "Due Process of Law," page 306, and cases from this court therein cited.

By this it is not meant that the legislative power is beyond judicial review. Such enactments as are arbitrary or unreasonable and thus exceed the exercise of legislative authority in good faith, may be declared invalid when brought in review by proper judicial proceedings. This is necessary to the assertion and maintenance of the supremacy of the Constitution.

Conceding then that the right of contract is a subject of judicial protection, within the authority given by the Constitution of the United States, the question here is, was the power of the State so arbitrarily exercised as to render its action unconstitutional and therefore void? It is said that this question is authoritatively determined in this court, in the case of *Adair* v. *United States*, 208 U. S. 161. In that case, a statute passed by the Congress of the United States, under supposed sanction of the power to regulate interstate commerce, was before this court, and it was there decided that the right of contract protected by the Fifth Amendment to the Constitution,

providing that no person shall be deprived of life, 'liberty or property without due process of law, avoided a statute which undertook to make it a crime to discharge an employé simply because of his membership in a labor organization. The feature of the statute which is here involved, making it an offense to require any employé, or any person seeking employment, as a condition of such employment, to enter into an agreement, either written or verbal, not to become a member of any labor corporation, association or organization,—a provision exactly similar to that of the Kansas statute now under consideration,—was not before the court upon the charge made or the facts shown, and this provision was neither considered nor decided upon in reaching the conclusion that an employer could not be made a criminal because he discharged an employé simply because of his membership in a labor organization. In the course of the opinion this fact was more than once stated, and the question before the court declared to be (208 U. S., p. 171):

"May Congress make it a criminal offense against the United States—as by the tenth section of the act of 1898 it does—for an agent or officer of an interstate carrier, having full authority in the premises from the carrier, to discharge an employé from service simply because of his membership in a labor organization?"

Such was the question before the court, and that there might be no mistake about it, at the close of the opinion, the part of the act upon which the defendant in that case was convicted was declared to be separable from the other parts of the act, and that feature of the statute the only subject of decision. Mr. Justice Harlan, concluding the opinion of the court said (p. 180):

"We add that since the part of the act of 1898 upon which the first count of the indictment is based, and upon which alone the defendant was convicted, *is severable from its other parts*, and as what has been said is sufficient to

dispose of the present case, *we are not called upon to consider other and independent provisions of the act,* such, for instance, as the provisions relating to arbitration. *This decision is therefore restricted to the question of the validity of the particular provision in the act of Congress making it a crime against the United States for an agent or officer of an interstate carrier to discharge an employé from its service because of his being a member of a labor organization."* (Italics mine.)

In view of the feature of the statute involved, the charge made, and this express reservation in the opinion of the court as to other features of the statute, I am unable to agree that that case involved or decided the one now at bar.

There is nothing in the statute now under consideration which prevents an employer from discharging one in his service at his will. The question now presented is, May an employer, as a condition of present or future employment, require an employé to agree that he will not exercise the privilege of becoming a member of a labor union, should he see fit to do so? In my opinion, the cases are entirely different, and the decision of the questions controlled by different principles. The right to join labor unions is undisputed, and has been the subject of frequent affirmation in judicial opinions. Acting within their legal rights, such associations are as legitimate as any organization of citizens formed to promote their common interest. They are organized under the laws of many States, by virtue of express statutes passed for that purpose, and, being legal, and acting within their constitutional rights, the right to join them, as against coercive action to the contrary may be the legitimate subject of protection in the exercise of the police authority of the States. This statute, passed in the exercise of that particular authority called the police power, the limitations of which no court has yet undertaken precisely to define, has for its avowed

purpose the protection of the exercise of a legal right, by preventing an employer from depriving the employé of it as a condition of obtaining employment. I see no reason why a State may not, if it chooses, protect this right, as well as other legal rights.

But it is said that the contrary must necessarily result, if not from the precise matter decided in the *Adair Case,* then from the principles therein laid down, and that it is the logical result of that decision that the employer may, as a condition of employment, require an obligation to forego the exercise of any privileges because of the exercise of which an employé might be discharged from service. I do not concede that this result follows from anything decided in the *Adair Case.* That case dealt solely with the right of an employer to terminate relations of employment with an employé, and involved the constitutional protection of his right so to do, but did not deal with the conditions which he might exact or impose upon another as a condition of employment.

The act under consideration is said to have the effect to deprive employers of a part of their liberty of contract, for the benefit of labor organizations. It is urged that the statute has no object or purpose, express or implied, that has reference to health, safety, morals, or public welfare, beyond the supposed desirability of leveling inequalities of fortune by depriving him who has property of some part of his "financial independence."

But this argument admits that financial independence is not independence of law or of the authority of the legislature to declare the policy of the State as to matters which have a reasonable relation to the welfare, peace and security of the community.

This court has many times decided that the motives of legislators in the enactment of laws are not the subject of judicial inquiry. Legislators, state and Federal, are entitled to the presumption that their action has been in

good faith and because of conditions which they deem proper and sufficient to warrant the action taken. Speaking for this court in *Ex parte McCardle*, 7 Wall. 506, 514, Chief Justice Chase summed up the doctrine in a sentence when he said: "We are not at liberty to inquire into the motives of the legislature. We can only examine into its power under the Constitution." In Cooley's Constitutional Limitations, 7th Ed., 257, that eminent author says: "They [the courts] must assume that legislative discretion has been properly exercised. If evidence was required, it must be supposed that it was before the legislature when the act was passed; and if any special finding was required to warrant the passage of the particular act, it would seem that the passage of the act itself might be held equivalent to such finding." "The rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile." *Soon Hing* v. *Crowley*, 113 U. S. 703, 710. "We must assume that the legislature acts according to its judgment for the best interests of the State. A wrong intent cannot be imputed to it." *Florida Central &c. R. R.* v. *Reynolds*, 183 U. S. 471, 480.

The act must be taken as an attempt of the legislature to enact a statute which it deemed necessary to the good

order and security of society. It imposes a penalty for "coercing or influencing or making demands upon or requirements of employés, servants, laborers, and persons seeking employment." It was in the light of this avowed purpose that the act was interpreted by the Supreme Court of Kansas, the ultimate authority upon the meaning of the terms of the law. Of course, if the act is necessarily arbitrary and therefore unconstitutional, mere declarations of good intent cannot save it, but it must be presumed to have been passed by the legislative branch of the state government in good faith, and for the purpose of reaching the desired end. The legislature may have believed, acting upon conditions known to it, that the public welfare would be promoted by the enactment of a statute which should prevent the compulsory exaction of written agreements to forego the acknowledged legal right here involved, as a condition of employment in one's trade or occupation.

It would be impossible to maintain that because one is free to accept or refuse a given employment, or because one may at will employ or refuse to employ another, it follows that the parties have a constitutional right to insert in an agreement of employment any stipulation they choose. They cannot put in terms that are against public policy either as it is deemed by the courts to exist at common law or as it may be declared by the legislature as the arbiter within the limits of reason of the public policy of the State. It is no answer to say that the greater includes the less and that because the employer is free to employ, or the employé to refuse employment, they may agree as they please. This matter is easily tested by assuming a contract of employment for a year and the insertion of a condition upon which the right of employment should continue. The choice of such conditions is not to be regarded as wholly unrestricted because the parties may agree or not as they choose. And if the State may pro-

hibit a particular stipulation in an agreement because it is deemed to be opposed in its operation to the security and well being of the community, it may prohibit it in any agreement whether the employment is for a term or at will. It may prohibit the attempt in any way to bind one to the objectionable undertaking.

Would anyone contend that the State might not prohibit the imposition of conditions which should require an agreement to forego the right on the part of the employé to resort to the courts of the country for redress in the case of disagreement with his employer? While the employé might be discharged in case he brought suit against an employer if the latter so willed, it by no means follows that he could be required, as a condition of employment, to forego a right so obviously fundamental as the one supposed. It is therefore misleading to say that the right of discharge necessarily embraces the right to impose conditions of employment which shall include the surrender of rights which it is the policy of the State to maintain.

Take another illustration: The right to exclude a foreign corporation from carrying on a purely domestic business in the State has been distinctly recognized by decisions of this court; yet it has been held, and is now settled law, that it is beyond the authority of the State to require a corporation doing business of this character to file in the office of the Secretary of State a written agreement that it will not remove a suit, otherwise removable, to a Federal court of the United States. *Insurance Co.* v. *Morse,* 20 Wall. 445. In that case, the right to exclude was held not to include the right to impose any condition under which the corporation might do business in the State. In that connection this court said:

"A man may not barter away his life or his freedom, or his substantial rights. In a criminal case, he cannot, as was held in *Cancemi's Case,* be tried in any other manner than by a jury of twelve men, although he consent in open

court to be tried by a jury of eleven men. In a civil case he may submit his particular suit by his own consent to an arbitration, or to the decision of a single judge. So he may omit to exercise his right to remove his suit to a Federal tribunal, as often as he thinks fit, in each recurring case. In these aspects any citizen may no doubt waive the rights to which he may be entitled. He cannot, however, bind himself in advance by an agreement, which may be specifically enforced, thus to forfeit his rights at all times and on all occasions, whenever the case may be presented." *Insurance Co.* v. *Morse,* 20 Wall. 445, 451.

It may be that an employer may be of the opinion that membership of his employés in the National Guard, by enlistment in the militia of the State, may be detrimental to his business. Can it be successfully contended that the State may not, in the public interest, prohibit an agreement to forego such enlistment as against public policy? Would it be beyond a legitimate exercise of the police power to provide that an employé should not be required to agree, as a condition of employment, to forego affiliation with a particular political party, or the support of a particular candidate for office? It seems to me that these questions answer themselves. There is a real and not a fanciful distinction between the exercise of the right to discharge at will and the imposition of a requirement that the employé, as a condition of employment, shall make a particular agreement to forego a legal right. The *agreement* may be, or may be declared to be, against public policy, although the right of discharge remains. When a man is discharged, the employer exercises his right to declare such action necessary because of the exigencies of his business, or as the result of his judgment for other reasons sufficient to himself. When he makes a stipulation of the character here involved essential to future employment, he is not exercising a right to discharge, and may not wish to discharge the employé when, at a

subsequent time, the prohibited act is done. What is in fact accomplished, is that the one engaging to work, who may wish to preserve an independent right of action, as a condition of employment, is coerced to the signing of such an agreement against his will, perhaps impelled by the necessities of his situation. The State, within constitutional limitations, is the judge of its own policy and may execute it in the exercise of the legislative authority. This statute reaches not only the employed but as well one seeking employment. The latter may never wish to join a labor union. By signing such agreements as are here involved he is deprived of the right of free choice as to his future conduct, and must choose between employment and the right to act in the future as the exigencies of his situation may demand. It is such contracts, having such effect, that this statute and similar ones seek to prohibit and punish as against the policy of the State.

It is constantly emphasized that the case presented is not one of coercion. But in view of the relative positions of employer and employed, who is to deny that the stipulation here insisted upon and forbidden by the law is essentially coercive? No form of words can strip it of its true character. Whatever our individual opinions may be as to the wisdom of such legislation, we cannot put our judgment in place of that of the legislature and refuse to acknowledge the existence of the conditions with which it was dealing. Opinions may differ as to the remedy, but we cannot understand upon what ground it can be said that a subject so intimately related to the welfare of society is removed from the legislative power. Wherein is the right of the employer to insert this stipulation in the agreement any more sacred than his right to agree with another employer in the same trade to keep up prices? He may think it quite as essential to his "financial independence" and so in truth it may be if he alone is to be considered. But it is too late to deny that the legis-

lative power reaches such a case. It would be difficult to select any subject more intimately related to good order and the security of the community than that under consideration—whether one takes the view that labor organizations are advantageous or the reverse. It is certainly as much a matter for legislative consideration and action as contracts in restraint of trade.

It is urged that a labor organization—a voluntary association of working-men—has the constitutional right to deny membership to any man who will not agree that during such membership he will not accept or retain employment in company with non-union men. And it is asserted that there cannot be one rule of liberty for the labor organization and its members and a different and more restrictive rule for employers.

It of course is true, for example, that a Church may deny membership to those who unite with other denominations, but it by no means follows that the State may not constitutionally prohibit a railroad company from compelling a working-man to agree that he will, or will not, join a particular church. An analogous case,—viewed from the employer's standpoint, would be: Can the State, in the exercise of its legislative power, reach concerted effort of employés intended to coerce the employer as a condition of hiring labor that he shall engage in writing to give up his privilege of association with other employers in legal organizations, corporate or otherwise, having for their object a united effort to promote by legal means that which employers believe to be for the best interest of their business?

I entirely agree that there should be the same rule for employers and employed, and the same liberty of action for each. In my judgment, the law may prohibit coercive attempts, such as are here involved, to deprive either of the free right of exercising privileges which are theirs within the law. So far as I know, no law has undertaken

to abridge the right of employers of labor in the exercise of free choice as to what organizations they will form for the promotion of théir common interests, or denying to them free right of action in such matters.

But it is said that in this case all that was done in effect was to discharge an employé for a cause deemed sufficient to the employer—a right inherent in the personal liberty of the employer protected by the Constitution. This argument loses sight of the real purpose and effect of this and kindred statutes. The penalty imposed is not for the discharge but for the attempt to coerce an unwilling employé to agree to forego the exercise of the legal right involved as a condition of employment. It is the requirement of such agreements which the State declares to be against public policy.

I think that the act now under consideration, and kindred ones, are intended to promote the same liberty of action for the employé as the employer confessedly enjoys. The law should be as zealous to protect the constitutional liberty of the employé as it is to guard that of the employer. A principal object of this statute is to protect the liberty of the citizen to make such lawful affiliations as he may desire with organizations of his choice. It should not be necessary to the protection of the liberty of one citizen that the same right in another citizen be abridged or destroyed.

If one prohibitive condition of the sort here involved may be attached, so may others, until employment can only be had as the result of written stipulations, which shall deprive the employé of the exercise of legal rights which are within the authority of the State to protect. While this court should, within the limitations of the constitutional guaranty, protect the free right of contract, it is not less important that the State be given the right to exert its legislative authority, if it deems best to do so, for the protection of rights which inhere in the privileges of the citizen of every free country.

The Supreme Court of Kansas in sustaining this statute, said that "employés as a rule are not financially able to be as independent in making contracts for the sale of their labor as are employers in making a contract of purchase thereof," and in reply to this it is suggested that the law cannot remedy inequalities of fortune, and that so long as the right of property exists, it may happen that parties negotiating may not be equally unhampered by circumstances.

This view of the Kansas court, as to the legitimacy of such considerations, is in entire harmony, as I understand it, with the former decisions of this court in considering the right of state legislatures to enact laws which shall prevent the undue or oppressive exercise of authority in making contracts with employés. In *Holden* v. *Hardy,* 169 U. S. 366, this court considering legislation limiting the number of hours during which laborers might be employed in a particular employment, said:

"The legislature has also recognized the fact, which the experience of legislators in many States has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employés, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority. . . . But the fact that both parties are of full age and competent to contract does not necessarily deprive the State of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to

the contract shall be protected against himself. 'The State still retains an interest in his welfare, however reckless he may be. The whole is no greater' than the sum of all the parts, and when the individual health, safety and welfare are sacrificed or neglected, the State must suffer.'" (Page 397.)

This language was quoted with approval in *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire*, 219 U. S. 549, 570, in which a statute of Iowa was sustained, prohibiting contracts limiting liability for injuries made in advance of the injuries received, and providing that the subsequent acceptance of benefits under such contracts should not constitute satisfaction for injuries received after the contract. Certainly it can be no substantial objection to the exercise of the police power that the legislature has taken into consideration the necessities, the comparative ability, and the relative situation of the contracting parties. While all stand equal before the law, and are alike entitled to its protection, it ought not to be a reasonable objection that one motive which impelled an enactment was to protect those who might otherwise be unable to protect themselves.

I therefore think that the statute of Kansas, sustained by the Supreme Court of the State, did not go beyond a legitimate exercise of the police power, when it sought, not to require one man to employ another against his will, but to put limitations upon the sacrifice of rights which one man may exact from another as a condition of employment. Entertaining these views, I am constrained to dissent from the judgment in this case.

I am permitted to say that MR. JUSTICE HUGHES concurs in this dissent.