618 A.2d 338

ROBERT BERNARD, PLAINTIFF–RESPONDENT, v. IMI
SYSTEMS, INC., MARVIN GOLDBERG AND ROBERT
S. FORMAN, DEFENDANTS–APPELLANTS.

Argued November 9, 1992—Decided January 25, 1993.

*Nicholas J. Taldone* argued the cause for appellants (*Shanley & Fisher*, attorneys).

*Bruce L. Atkins* argued the cause for respondent (*Contant, Scherby & Atkins*, attorneys; *Andrew T. Fede*, on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Plaintiff, Robert Bernard, alleges that he was unlawfully discharged by defendant, IMI Systems, Inc. (IMI), in violation of a written letter agreement of employment. This appeal poses questions concerning the interpretation of two provisions of that letter agreement: whether the provision "Your compensation will be at the rate of $80,000 per annum ..." creates a year-to-year contract of employment; and whether the provision "You will receive options on 2,000 shares of IMI stock ... at the time that you start work on a full time basis with IMI" lapses on an employee's termination of employment. The trial court ruled that the mere statement of a salary in annual terms does not overcome the presumption of an at-will contract, and that employees may exercise stock options only during their terms of employment.

In an unreported opinion, the Appellate Division reversed, finding that under *Willis v. Wyllys Corp.*, 98 *N.J.L.* 180, 119 *A.* 24 (E. & A. 1922), a salary quoted in annual terms establishes a year-to-year contract. The court also ruled that genuine issues of fact existed regarding the termination of the stock option. We granted defendants' petition for certification, 130 *N.J.* 9, 611 *A.*2d 648 (1992), but denied plaintiff's cross-petition, *ibid.* We affirm and modify the Appellate Division judgment, and we overrule *Willis.*

I

A. *Employment at IMI*

Because this appeal comes to us from a grant of summary judgment, we accept as true plaintiff's version of the facts, giving him the benefit of all inferences favorable to his claim. *R.* 4:46–2; *Portee v. Jaffee*, 84 *N.J.* 88, 90, 417 *A.*2d 521 (1980). IMI sent a letter dated September 1, 1987, confirming an offer of employment to Bernard to serve as its New Jersey Special Accounts Branch Manager. The letter, signed by Robert Forman, IMI's president, read as follows:

We enjoyed the opportunity to talk with you and were favorably impressed with your credentials and qualifications. The purpose of this letter is to confirm our offer to you as the New Jersey Special Accounts Branch Manager with IMI Systems Inc. (IMI). As we discussed the salient points of this offer are:

1. *Your compensation will be at the rate of $80,000 per annum to be paid semimonthly.*

2. You will begin to work part time on October 15, 1987 and will be working full time by November 15, 1987.

3. You will be eligible for IMI's company paid health, life insurance, and tuition refund plans. Effective start date for plans is October 15, 1987.

4. You will participate in the Managers Compensation Plan. Your incentive base will be $40,000.

5. *You will receive options on 2000 shares of IMI stock at the fair market value at the time that you start work on a full time basis with IMI.* An interest free loan would be available, if required, at option execution time.

6. You will receive a monthly car allowance of $500/month.

7. A November, 1987 bonus will be paid; this would amount to $4,500 in addition to a "pro-rated" amount.

8. Three (3) weeks of vacation per year are granted, with an option for a fourth week if business conditions warrant.

I look forward to your acceptance of this offer, and to your association with IMI being both profitable and personally rewarding. Please sign below to confirm your acceptance of our offer, and return one (1) executed copy to me by September 20, 1987. (emphasis added.)

Plaintiff signed and returned the letter. He began part-time employment with IMI on October 15, 1987, and became a full-time employee on November 15, 1987. He contends that while at IMI he improved the sales and profits, both domestically and internationally, of his branch office. Nevertheless, on May 12, 1988, Goldberg, IMI's vice-president and Bernard's supervisor, asked Bernard to resign. When Bernard refused, he was fired, effective May 20, 1988. Plaintiff never reported to work at IMI after May 12, 1988.

### B. *The Stock Option*

In early 1988, IMI Vice President Thomas Krausz informed Bernard that his stock option had been recorded and that his written option agreement was being prepared. When plaintiff inquired about his shares, Krausz told him that he had an option of 10,000 shares at $4 per share, which was on file with the company. He also asserts that Krausz told him that he would receive a written option agreement that would contain terms differing from the agreements of other employees.

The option agreement was dated November 16, 1987, however, Bernard did not receive it until May 13, 1988, the day after his employment had been terminated. The option agreement set forth the terms of the options and the conditions on their exercise and provided that the option was to be exercised in accordance with a specific time schedule.

Paragraph 5(a) provides that the option may not be exercised after the employee's termination of employment for any reason other than death. Paragraph 14 also provides that the option agreement shall not confer on the employee any right with respect to continuance of employment by the company nor interfere with the company's right to terminate his employment at any time. During his employment Bernard did not request or attempt to exercise his stock options.

## C. Procedural History

After his termination plaintiff filed a fourteen-count wrongful dismissal complaint against IMI, its president, Robert Forman, and vice-president, Marvin Goldberg. The trial court granted summary judgment for defendants, dismissing most of the claims. The Appellate Division affirmed except with respect to the two claims that are before this Court: (1) that the company had breached Bernard's one-year employment contract by terminating him seven months after he had begun work, and (2) that the company had breached the stock-option agreement.

Defendants denied the allegations and moved for summary judgment dismissing the two counts. Defendant Forman submitted an affidavit in support of his motion for summary judgment, stating that the offer letter had quoted a salary in annual terms to conform with standard business practice and that plaintiff had known that the stock option expired on his termination of employment.

The trial court ruled that the letter agreement between the parties established an employment-at-will relationship and that the plaintiff could have exercised his stock option only while employed at IMI.

The Appellate Division, in an unreported decision, reversed, finding itself bound by our decision in *Willis, supra*. The court held that *Willis* is a rule of construction establishing that absent any clear expression of contrary intent, a contract that defines the employee's salary in annual terms is to be construed as a contract from year to year.

However, the court noted that the letter agreement had stated that it included the "salient points of the offer" and thus did not constitute a complete statement of the parties' intent. Accordingly, the court ruled that defendants could introduce competent parol evidence to prove that the parties' agreement included other terms that would render inapplicable the *Willis* rule of construction. Thus, if IMI could prove that a reason-

able person in Bernard's position would have understood that the offer letter established an employment-at-will relationship, then *Willis* would not preclude the trial court from finding that as a matter of law, such a relationship represented the agreement of the parties.

The Appellate Division also reversed on the stock-option issue. Forman and another IMI executive stated in affidavits that Bernard had known that the stock option expired on termination of employment, although he had never attempted to exercise it. Bernard, on the other hand, alleged in his affidavit that he had an unconditional stock-option right and that he had inquired about it during his employment; however, IMI did not forward the option agreement to him until after he had been terminated. The court found that because of the parties' conflicting statements about the termination of the stock option, genuine issues of fact barred summary judgment in favor of defendants.

Although the Appellate Division reversed and remanded the case for trial, the court made it clear that it did not believe that the policy behind *Willis* was sound.

> If we were free to reconsider the rule of construction enunciated in *Willis*, we would rule, as the motion judge did in the present matter, that in the absence of a contrary intent, an employee is hired as an employee at will. But *Willis* is a decision of our former Court of Errors and Appeals which has not been overruled or modified by our present Supreme Court. * * * The rule of construction which *Willis* adopted is therefore binding on the Law Division judge as it is on us.

■ We agree that in the absence of a contrary agreement, an employee is hired at-will, regardless of the way in which the salary is quoted in an offer letter. We therefore overrule *Willis*.

## II

### A. *The History of At–Will Employment—The "English View" v. The "American View"*

In the 1922 *Willis* decision, the Court of Errors and Appeals stated that New Jersey had adopted the "English view" of

employment law which "tends to a construction establishing a contract for a definite term if this can be spelled out of the language used." *Willis, supra,* 98 *N.J.L.* at 181, 119 *A.* 24. The majority of jurisdictions in 1922 had adopted the "American view" which states that "a hiring is at-will unless the contrary be fairly plain." *Ibid.*

Defendants argue that *Willis* is an anachronism that does not comport with this Court's recent decisions holding that absent a statute, public-policy mandate, or agreement to the contrary, contracts of employment of an indefinite duration are at-will. *See Shebar v. Sanyo Business Sys. Corp.,* 111 *N.J.* 276, 285, 544 *A.*2d 377 (1988); *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 191, 536 *A.*2d 237 (1988); *Woolley v. Hoffmann–La Roche,* 99 *N.J.* 284, 289, 491 *A.*2d 1257, *modified on other grounds,* 101 *N.J.* 10, 499 *A.*2d 515 (1985). Plaintiff, on the other hand, argues that despite the fact that the majority of states follow the "American view," the *Willis* holding is sound law that comports with this Court's history of protecting employee rights.

We agree with defendants and hold that New Jersey courts are no longer bound by *Willis.* The "English view," which *Willis* embraced, was appropriate for the agrarian economy of medieval England, where the relationship between masters and servants was governed in part by seasonal and agricultural cycles. With the establishment of a market economy in the United States, there is no longer a need for rules based on feudal custom. Thus, in light of the change in employee-employer relations over the past seventy years, we adopt the "American view."

Under the English Ordinance and Statute of Labourers, promulgated in 1349, masters hired servants for yearly cycles to coincide with the feudal practice of paying people annually. 23 Edw. 3. ch. 1–7 (1349); Cheryl S. Massingale, *At–Will Employment: Going, Going . . .,* 24 *U.Rich.L.Rev.* 187 (1990); Larson and Borowsky, *Unjust Dismissal,* § 2.02 (1991). The English

enacted the Statute of Labourers to guarantee a supply of workers for an agricultural economy that had both productive and nonproductive seasons. The law prevented employers from discharging people in the winter when work was scarce and prevented employees from leaving at planting or harvest time when the employers needed them most. Gradually, the statute changed to allow dismissal for "reasonable and sufficient cause." 5 Eliz., ch. 4, § V (1562).

The English viewed employer-employee relations as more of a social relationship than a legal one. This social relationship was based on customary categories or "status" relationships between people. A person owed other individuals specified duties or responsibilities based on his or her status. The common law required masters to provide shelter for the servants and to supervise the development of their skills and morals. The relationship obliged the servants, in turn, to work dutifully and industriously. Henry Perritt, *Employee Dismissal Law and Practice*, § 1.3, p. 9 (3rd Ed.1992) (hereafter "Perritt"); Gary E. Murg and Clifford Scharman, *Employment-at-Will: Do the Exceptions Overwhelm the Rule?*, 23 *B.C.L.Rev.* 329 (1982).

The contractual view of employer-employee relations became entrenched in English jurisprudence when, in 1765, Blackstone wrote:

> The three great relations in private life are, (1) that of master and servant; which is founded in convenience, whereby a man is directed to call in the assistance of others, where his own skill and labor will not be sufficient to answer the cares incumbent upon him; (2) that of husband and wife * * * [and] (3) that of guardian and wards * * *.
>
> The first sort of servants therefore, acknowledged by the laws of England, are menial servants; so called from being intra moenia. The contract between them and their masters arises upon the hiring. If hiring be general, without any particular time limited, the law construes it to be hiring for a year; upon a principle of natural equity, that the servant shall serve and the master maintain him throughout all the revolutions of the respective seasons, as well when there is work to be done as when there is not; but the contract may be made for any larger or smaller term.
>
> [1 W. Blackstone, *Commentaries* 422, 425 Christian ed. (1793), 1st. ed. London (1765).]

Although the Statute of Labourers afforded employers a unilateral right to fire employees for cause, as late as 1823 the law subjected employees to criminal sanctions for attempting to terminate the relationship before year's end. 4 Geo. IV ch. 34 (1823). Perritt, *supra*, § 1.3, at 10. Moreover, before the Industrial Revolution, a person who attempted to lure a servant from another master could face civil penalties for improper interference with the master-servant relationship. Note, *Tortious Interference with Contractual Relations: The Transformation of Property, Contract and Tort*, 93 *Harv.L.Rev.* 1510, 1513–22 (1980).

Thus, the combination of the duty to work, prohibitions against leaving a job before the end of the term, and the need for a steady stream of employees led to a law that protected employees but at the same time prevented them from leaving their jobs prematurely. Seymour Moskowitz, *Employment–At–Will & Codes of Ethics: The Professional's Dilemma*, 23 *Val.U.L.Rev.* 33 (1988) (hereafter "Moskowitz"), and Note, *Tortious Interference with Contractual Relations*, 93 *Harv. L.Rev., supra*, 1513–22.

Although Parliament repealed the Statute of Labourers in 1863, English courts continued to follow its principles, especially provisions that allowed parties to rebut the presumption of yearly hiring by showing trade custom, frequency of payments, or a contrary agreement between the parties. Moskowitz, *supra*, 23 *Val.U.L.Rev.* at 36–37. Larson and Borowsky, *Unjust Dismissal*, § 2.02 (1991).

The Industrial Revolution changed employer-employee relations. As employers required larger workforces to deal with the increasing use of factories and mechanization, economic rather than social forces governed the relationships. Unpredictable market forces replaced the relatively predictable agrarian economy, and thus employers had neither the need nor the desire to hire people on yearly cycles. Perritt, *supra*, § 1.4. Furthermore, employees sought shorter contracts and took

advantage of collective-bargaining efforts that attempted to decriminalize the breach of employment contracts. *Ibid.* The doctrine of freedom-of-contract, which became increasingly popular in the late 19th century, emphasized allowing individuals to strike their own bargains, rather than relying on customary contractual terms. This doctrine encouraged masters and servants to set their own wages and terms of employment rather than using presumptive terms. Consequently, employers and employees began to reevaluate the efficacy of a rule that bound people to annual employment.

In the United States, some courts adhered to the English rule for agricultural workers but used an employment-at-will rule for other employees. Other courts used the employee's wage period as an indicator of the term of employment. Still other courts looked to the intent of the parties and the circumstances surrounding the transaction. Peter Stone Partee, *Reversing the Presumption of Employment-at-Will,* 44 *Vand.L.Rev.* 689 (1991).

In 1877, New York attorney H.B. Wood challenged the English doctrine and articulated what is now known as the "American view." Without citing valid precedent and despite the lack of uniform application of either the English view or the at-will rule, Wood's treatise stated authoritatively that

> [w]ith us [Americans] the rule is inflexible, that a general or indefinite hiring is prima facie a hiring at will, and if the servant seeks to make it a yearly hiring, the burden is upon him to establish it by proof. A hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring and no presumption attaches that it was for a day even, but only at the rate fixed for whatever time the party may serve.
>
> [H.B. Wood, *Treatise on the Law of Master and Servant,* § 134, at 272 (1877).]

Although Wood cited four cases to support his proposition, all were unique cases decided mainly on procedural grounds, and none of them established employment-at-will relationships. For an analysis of the cases that Wood cited as precedent *see Toussaint v. Blue Cross & Blue Shield,* 408 *Mich.* 579, 292 *N.W.*2d 880 (1980).

Despite the tenuous grounds for "Wood's rule," American courts almost universally and unquestioningly accepted it, quickly converting his evidentiary presumption into substantive law. Moskowitz, *supra*, 23 *Val.U.L.Rev.* at 35; Perritt, *supra*, § 1.4, at 13. By 1913, the majority of American jurisdictions had adopted Wood's employment-at-will rule, even in cases in which employers offered permanent employment, unless the employee could prove special consideration independent of his services. Perritt, *supra*, § 1.4, at 13. Indeed, though critical of the theory, Williston declared Wood's doctrine the universal rule. Williston, 1 *Williston on Contracts* § 39 (rev. ed. 1939).

At its height of acceptance, the employment-at-will doctrine achieved almost constitutional status as the Supreme Court found support for it in the Due Process Clause. *See Coppage v. Kansas*, 236 *U.S.* 1, 35 *S.Ct.* 240, 59 *L.Ed.* 441 (1915) (striking down state laws that prohibited firing of union members as violative of due process); *Adair v. United States*, 208 *U.S.* 161, 28 *S.Ct.* 277, 52 *L.Ed.* 436 (1908) (striking down federal laws that prohibited firing of union members). The rule fell out of constitutional favor in 1937, when federal legislators began to address the needs of employees. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 *U.S.* 1, 57 *S.Ct.* 615, 81 *L.Ed.* 893 (1937).

Gradually, courts began to erode the employment-at-will doctrine and to uphold laws that carved out exceptions. The trend shifted from protecting management under the guise of "freedom of contract" to protecting individual workers. Although different commentators cite different statistics, most agree that in the 1980s, collective-bargaining agreements protected approximately one fifth of nonagricultural workers. Note, *Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception*, 96 *Harv.L.Rev.* 1931, 1934 (1983). In addition, nineteen percent of workers are either state or federal employees, and therefore they enjoy civil-service protection. *Ibid.* Currently, almost every state has adopted exceptions to the employment-at-will doctrine including public policy torts,

implied covenants of good faith and fair dealing, and implied-in-fact contracts for tenure. (*See* Perritt, *supra*, § 1.9, at 18–20, and pp. 26–65 for a state-by-state summary.) *See also* Comment, *Limiting the Employment–At–Will Rule: Enforcing Policy Manual Promises Through Unilateral Contract Analysis*, 16 *Seton Hall L.Rev.* 465 (1986).

Thus, with the passage of various laws protecting laborers, members of minority groups, women, union members, civil servants, and the workforce at large, the employment-at-will doctrine no longer provides employers with unfettered power. *See, e.g., Railway Labor Act*, 45 *U.S.C.A.* § 151 et seq. (West 1992); *Civil Rights Act of 1964*, 42 *U.S.C.* § 2000e–2 (West 1992); *National Labor Relations Act of 1935*, 29 *U.S.C.* §§ 151–169 (West 1992); *Fair Labor Standards Acts of 1938*, 29 *U.S.C.* §§ 201–219 (West 1992); and *Occupational Safety and Health Act*, 29 *U.S.C.* §§ 651–678 (West 1992). Nevertheless, despite these protective measures, in 1985, more than half of the work force in the private sector were subject to the employment-at-will doctrine. Moskowitz, *supra*, 23 *Val. U.L.Rev.* at 34.

### B. *Employment-at-Will In New Jersey*

Until today, New Jersey courts have remained in the minority and have followed the "English view" as enunciated in *Willis v. Wyllys Corp., supra*, 98 *N.J.L.* 180, 119 *A.* 24. In *Willis*, plaintiff received an offer letter in which the employer quoted the salary in annual terms, just as in Bernard's case. The letter stated:

Dear Mr. Willis—Confirming the arrangements made with you at our conference last Tuesday we engage your services as Assistant Comptroller in Charge of Factory Accounting with *a salary at the rate of $7,500.00 per year*, with the understanding that if the connection proves satisfactory the salary, beginning with January 1, 1921, will be at the rate of $9,000.00 per year.

In further confirmation of our arrangements it is understood that the company will pay the expenses of moving your household effects from Cleveland. I hope that you managed to make your train and arrived home safely, and I am looking forward to seeing you next Monday, the 12th inst.

Very truly yours,

(signed) A. Luery,

Comptroller

[emphasis added.]

Willis commenced work on July 12, 1920. At the end of February, 1921, the company fired Willis, without cause. Willis sued for damages claiming that the company had hired him for one year. Defendant countered that plaintiff was an employee at will.

The Court concluded that the letter alone, viewed as the entire contract, established a year-long term of employment. 98 *N.J.L.* at 181, 119 *A.* 24. Significantly, the Court noted that defendant had proposed and paid for plaintiff's move from Cleveland, which would indicate a desire to establish some degree of permanent employment. *Id.* at 182, 119 *A.* 24.

At trial the court allowed Willis to show that the letter was in pursuance of an oral conversation in which he claimed that there was a definite proposition and agreement of hiring by the year. *Id.* at 181, 119 *A.* 24. However, although the Court of Errors and Appeals considered only the letter agreement, it ruled that any error in the consideration of that parol evidence was harmless. *Id.* at 182, 119 *A.* 24. After examining the letter agreement, the Court found a year-to-year contract.

Although the Court recognized that most American jurisdictions had adopted the "American view" establishing employment-at-will, it found that prior New Jersey cases had adhered to the "English view." Accordingly, it ruled that the trial court would have been justified in instructing the jury that the offer letter had established a hiring by the year.

Our courts have reviewed numerous employment cases in the seventy years since *Willis;* however, no court in fifty years has

explicitly discussed *Willis*.[1] In *Dennis v. Thermoid Co.*, 128 *N.J.L.* 303, 25 *A.*2d 886 (E. & A.1942), the Court explicitly recognized *Willis'* validity, and held that the facts supported the conclusion that defendant intended to hire plaintiff for one year. As in the *Willis* case, plaintiff in *Dennis* had moved from across the country to assume a new position. The Court noted that Dennis had family and friends in Dallas, and after "much persuasion" had agreed to move. The Court found that it was "obvious" that the parties did not consider the move temporary since "the plaintiff had given years of faithful and unstinting work to the defendant company [and] [h]e was disposing of his home, moving his family to a strange city and undertaking new work in an unknown territory." *Id.* at 304, 25 *A.*2d 886. In addition, like the Wyllys Corporation, Thermoid Company had agreed to pay all of plaintiff's moving expenses. Based on these facts, the Court found that not only did the contract guarantee employment for one year, but if the employment continued for a day after the first year, the contract guaranteed an additional year's work. *Id.* at 305, 25 *A.*2d 886.

Defendant persuasively argues that because "there was not one shred of evidence of any detrimental reliance," such as plaintiff having to move across the country, his case is more analogous to the more recent case of *Hindle v. Morrison Steel Co.*, 92 *N.J.Super.* 75, 223 *A.*2d 193 (App.Div.1966). In *Hindle*, the court held that in the absence of an explicit contract, employment is generally at-will and subject to termination with or without cause. *Id.* at 81, 223 *A.*2d 193. The *Hindle* court, without citing *Willis*, concluded that the plaintiff had the burden of proving that his employer had established a fixed term of employment, rather than one at-will. 92 *N.J.Super.* at 81, 223 *A.*2d 193. Like Bernard, Hindle had argued that the

---

[1] Although we did cite *Willis* in *Woolley v. Hoffmann–La Roche, supra,* 99 *N.J.* at 305 n. 11, 491 *A.*2d 1257, *modified,* 101 *N.J.* 10, 499 *A.*2d 515, we stated then that the *Willis* issue of fixed-term employment was not before us. Thus, we had no reason to reconsider the validity of the case.

company had hired him at an annual salary and paid him annual bonuses, thereby establishing year-to-year employment. However, the court, "not impressed" by the plaintiff's argument, found that the stating of salary and benefits in annual terms does not, standing alone, rebut the presumption of employment-at-will. *Id.* at 82, 223 *A.*2d 193. Instead, the court looked to the surrounding circumstances, including industry practice, and determined that the plaintiff had failed to provide evidence to show that the defendant had hired him for a specific length of time. *Ibid.* (citing *Dennis v. Thermoid Co.,* 128 *N.J.L.* 303, 25 *A.*2d 886 (E. & A. 1942)).

More recently, this Court has definitively established employment-at-will as the prevailing doctrine in this state, though we have recognized exceptions. In *Pierce v. Ortho Pharmaceuticals,* 84 *N.J.* 58, 417 *A.*2d 505 (1980), we ruled that unless employers act contrary to a clear mandate of public policy, they may discharge at-will employees for any reason. *Id.* at 72, 417 *A.*2d 505. *See also Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 609 *A.*2d 11 (1992) (holding that oil company's firing of employee who failed random urine screening did not violate clear mandate of public policy).

We have also ruled that provisions in a company's employment manual, distributed to and relied on by employees, may contractually bind the company to its terms, even if the employment was for an indefinite term and thus, would otherwise be at-will. *Woolley v. Hoffmann–La Roche, supra,* 99 *N.J.* at 285–86, 491 *A.*2d 1257. Thus, we found that absent a prominent and clear disclaimer in the employee manual, a court could enforce an implied promise that an employee could be fired only for cause. *Id.* at 285–86, 491 *A.*2d 1257.

Finally, in *Shebar v. Sanyo Business Sys. Corp., supra,* 111 *N.J.* 276, 544 *A.*2d 377, we reinforced our view that under the New Jersey common law, employers have been able to terminate at-will employees for cause or for no cause at all provided that the firing does not offend public policy. *Id.* at 285, 544

A.2d 377; *Velantzas v. Colgate–Palmolive Co., supra,* 109 *N.J.* at 192, 536 *A.*2d 237. Although we warned that "not every relinquishment of a prior job or job offer" would constitute consideration sufficient to overcome the at-will presumption, we held that in Shebar's case, a reasonable jury could make such inferences based on the facts surrounding that case. 111 *N.J.* at 289–90, 544 *A.*2d 377.

### C. *Current Law*

Employment law has matured since we chose to adhere to the English view in 1922. Today, both employers and employees commonly and reasonably expect employment to be at-will, unless specifically stated in explicit, contractual terms. Moreover, it is common business practice to state employee salary, bonus, vacation, sick days and other benefits in annual terms. Thus, in today's volatile employment market, it is both uncommon and unreasonable to expect employment for one year simply because an offer letter quotes an annual salary. Employees realize that the specification of salary merely determines the method of payment and not the time of employment. A salary or benefit package stated in annual terms does not, standing alone, entitle an employee to year-to-year employment.

Nevertheless, because plaintiff relied on *Willis,* we remand this issue to the Law Division to give the parties an opportunity to produce evidence to prove whether they intended to contract for year-to-year employment or for employment-at-will.

### III

We now turn to plaintiff's claim that defendants breached their promise to offer plaintiff an option to purchase company stock. Paragraph 5(a) of the stock option agreement provides:

> If the Employee's employment shall terminate otherwise than by reason of death, this option may not be exercised following such termination of employment.

Plaintiff asserts that paragraph 5(a) gave him an unambiguous "option to purchase the stock without limitations" meaning that he can purchase the stock for an unlimited period of time after the termination of his employment. We find that position to be unpersuasive. The letter agreement by its very terms "discussed [only] the salient points" of the offer. Moreover, a reading of the letter agreement indisputably establishes that it was not intended to set forth the terms and conditions of the grant and exercise of the stock options any more than it was intended to set forth the terms and conditions of IMI's company paid health, life insurance, tuition refund plans, and Managers Compensation Plan. No one would seriously question that those employee benefits would terminate upon an employee's termination of employment. Likewise, it is not uncommon for an employee's right to exercise a stock option to terminate upon such employee's termination from employment. *See Midfelt v. Lair,* 221 *Kan.* 557, 561 *P.*2d 805, 812 (1977) (construing oral contract and holding that absent unusual circumstances or enforceable contract provisions to the contrary, option to purchase stock terminates on cessation of employer-employee relationship). Moreover, stock options are an incentive to "stimulate the efforts of key employees and to strengthen the desire of such employees to remain in the employment of the Corporation." *Copeland v. Gordon Jewelry Corp.,* 288 *So.*2d 404, 407–08 (La.Ct.App.1974). Such incentives do not apply to terminated employees.

Furthermore, the terms and conditions surrounding the grant and exercise of stock options are traditionally set forth in an option agreement. Plaintiff acknowledges in his certification that he knew that the terms of his stock options were to be set forth in his "promised stock option agreement."

On March 31, 1988, stock option agreements were given to me to distribute to the key employees in my branch. I inquired as to my promised stock option agreement and was told by Tom Krauss [sic] that my 10,000 shares at $4.00 per share were on file with the company. He also apologized for the delay in writing up my agreement, because as a senior manager, the agreement was to be on different terms than other employees.

■ We do not agree with plaintiff's position that solely on the basis of paragraph 5(a) he received an unlimited time to exercise his option. We do think, however, that there are genuine issues of fact to whether IMI breached its agreement to provide him with an exercisable stock option. Plaintiff claims that IMI never gave him the opportunity to exercise his option and asserts:

Despite my demands for same, IMI never afforded me the stock option agreement I was promised. After I was terminated, IMI forwarded me a proposed stock option agreement. This proposed agreement contained conditions not a part of the September 1987 agreement.

It is undisputed that the plaintiff did not receive the option agreement until the day after he was fired. Krausz, the Secretary of IMI who was responsible for administering the exercise of employee stock options at IMI, confirmed Bernard's certification that he had been advised that his written option agreement was forthcoming:

During early 1988, option agreements for a number of employees, including Mr. Bernard, were being prepared. I gave Mr. Bernard a number of option agreements to be delivered to his subordinates. I also confirmed that his options had been recorded and that his written agreement would be forthcoming. Mr. Bernard agreed to my suggestion that his subordinates receive their agreements first.

In that same affidavit Krausz affirms:

The various terms and conditions of IMI employee stock options were and are set out in written standard option Agreements between the individual employees and IMI. Apart from the number of shares, the exercise price, and, in some instances, the period over which the options vest, the terms of the standard agreements do not vary.

One of the standard terms in the Option Agreements provided that the options would expire upon the termination (other than by death) of the holder's employment at IMI.

Krausz states that the terms of IMI's option agreements are standard and do not vary. Examining the option agreement given to plaintiff, one would have to agree that it is indeed a very typical standard option agreement. One must, therefore, question why such a standard stock option agreement took so long to produce. Plaintiff alleges that he was explicitly informed that his option had different terms and that he would

soon be receiving his option agreement. Forman, the President of IMI, however, stated in his affidavit that at the meeting of September 11, 1987, he and plaintiff discussed the options he was to receive in some detail:

> I informed him that the options would vest over a period of three years in accordance with our standard plan. This was the same format that our company had been using since its inception in 1979.
>
> Mr. Bernard and I never agreed that his employee stock options would be unconditional, or could immediately be exercised in full. Nor did we ever agree that the options would continue to exist beyond the termination of his employment.

The "coincidence" of plaintiff receiving a standard option agreement the day after he was fired does raise the questions of whether his option agreement was deliberately withheld until his employment status was finally resolved or whether, as plaintiff alleges, his proposed option agreement was to have different terms than the standard option agreement he received.

The stock option was a term of Bernard's employment contract. Therefore, the finder of fact must construe this term like any other contractual term. Under New Jersey law, courts look to the objective of the parties as manifested by the language in the contract and the circumstances of the surrounding transaction. *Jacobs v. Great Pac. Century Corp.*, 104 *N.J.* 580, 518 *A.*2d 223 (1986); *Communication Workers of Am., Local 1087 v. Monmouth County Bd. of Social Servs.*, 96 *N.J.* 442, 476 *A.*2d 777 (1984). Bernard, therefore, should be entitled to exercise his option subject to the terms and conditions of the option agreement that the trier of fact determines IMI intended to give to him as a condition of his employment.

For the foregoing reasons, we affirm the judgment of the Appellate Division, as modified, and remand the case to the Law Division for proceedings consistent with this opinion.

CLIFFORD, J., concurring in judgment.

An offer of employment "at the rate of $80,000 per annum to be paid semimonthly" so obviously contemplates an employ-

ment at will rather than for a fixed term that I see no need to imperil the nation's forests in making the point. "Our life is frittered away by detail * * *. Simplify, simplify." Henry D. Thoreau, *Walden* 91 (J. Lyndon Shanley ed., 1971 (1854)).

This case is readily distinguishable from *Willis v. Wyllys Corp.*, 98 *N.J.L.* 180, 119 *A.* 24 (E. & A. 1922); but because *Willis* now represents little more than a curious anachronism, a quaint relic of times past, I join the Court in overruling it.

CLIFFORD, J., concurs in result.

*For modification; affirmance and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.