**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2761-21

KEDAR TELANG,

    Plaintiff-Appellant,

v.

MERCK SHARPE & DOHME
CORP.,

    Defendant-Respondent.

_____

> Submitted January 18, 2024 – Decided February 13, 2024
>
> Before Judges Currier and Vanek.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2347-18.
>
> Kedar Telang, appellant pro se (Raymond Joseph Siegler, on the brief).[1]
>
> Tucker Law Group LLC, attorneys for the respondent (Leslie Miller Greenspan and Dimitrios Mavroudis, on the brief).

---

[1] Plaintiff submitted a pro se supplemental brief after a substitution of attorney was filed designating him as a self-represented litigant.

PER CURIAM

Plaintiff Kedar Telang appeals the March 29, 2022 order granting summary judgment to his prior employer, defendant Merck Sharp[2] & Dohme LLC (Merck), dismissing his unlawful retaliation claim under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Because the trial court did not err in finding plaintiff failed to establish a prima facie case or that Merck's reasons for actions taken before, during, and after plaintiff's employment were pretext, we affirm.

Plaintiff filed a three-count amended complaint alleging unlawful retaliation in violation of the LAD (count one), violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8 (count two), and violation of the New Jersey Fair Credit Reporting Act (NJFCRA), N.J.S.A. 56:11-28 to -43 (count three). On September 28, 2018, the trial court dismissed the CEPA claim on Merck's motion. On January 29, 2021, the trial court denied Merck's motion for summary judgment as to the LAD and NJFCRA claims. On March 29, 2022, the trial court granted summary judgment as to the LAD and NJFCRA claims on Merck's motion for reconsideration.

---

[2] Defendant is named in this litigation as Merck Sharpe & Dohme Corp. We use the name of the corporation set forth by defendant.

Plaintiff initially appealed the trial court orders dismissing all three counts of the amended complaint. However, plaintiff later withdrew the appeal of the orders dismissing counts two and three. Accordingly, this appeal is narrowed to only our review of the trial court's order granting summary judgment as to the LAD claim in count one.[3]

Although we review a motion for reconsideration for abuse of discretion, interlocutory orders are subject to review at any point prior to final judgment in the interest of justice. R. 4:42-2(b); see Lombardi v. Masso, 207 N.J. 517, 535-536 (2011). Since the order denying Merck's motion for summary judgment as to plaintiff's LAD and NJFCRA claims was interlocutory, the trial court did not err in exercising its discretion in the interest of justice to reconsider whether summary judgment was appropriately denied.

We review a trial court's grant or denial of a motion for summary judgment de novo, applying the same standard applied by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). As a result, we are tasked with determining "'whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving

---

[3] The trial court's written decision references the LAD claim as count three. The substance of the trial court's decision and the briefing establishes the LAD claim was count one of plaintiff's amended complaint.

party.'" C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305 (2023) (quoting Samolyk, 251 N.J. at 78). We view the facts in the motion record under this lens in the light most favorable to plaintiff for purposes of determining whether the trial court improvidently granted summary judgment as to plaintiff's LAD claim.

Plaintiff, who is a United States citizen of Indian origin, was employed by non-party Covanta as a finance manager from November 2011 through March 2016. Plaintiff alleges Covanta discriminated against him based on his national origin. Plaintiff's complaints of discrimination to Covanta's human resources (HR) team were predicated on excluding him from key meetings, unfairly denying his request for a promotion, and placing him on a sixty-day performance improvement plan. Plaintiff was subsequently terminated from his position at Covanta, which he attributed to retaliation for filing complaints with HR.

After plaintiff was terminated by Covanta, he interviewed for two positions with Merck: associate director and senior specialist. Two of Merck's directors, John Kennedy and Matt Butler, interviewed plaintiff for the associate director position. According to plaintiff, during the interview, Butler made an inappropriate comment regarding plaintiff's alleged "greed" and Kennedy "unfairly" conducted the technical analysis of his skills. On May 11, 2016,

4

plaintiff received an email stating Merck hired another candidate who better fit the requirements of the associate director position.

In August 2016, plaintiff was interviewed for the senior specialist position by Merck's hiring director, Elaine Gin, and executive director, Diana Gengos. According to plaintiff, Gengos told him during the interview his experience was "much more suited" for the associate director position. Although Merck told plaintiff the associate director position was going to be filled by another candidate, Gengos stated during the interview the position was still vacant.

Plaintiff subsequently learned that companies he had interviewed with were told plaintiff had pending litigation against Covanta when attempting to verify his employment history. Plaintiff wrote a letter to Covanta asking it to investigate this alleged misstatement and clarifying that there was no pending litigation between him and Covanta. Plaintiff shared this letter with Merck's job recruiter, Kim Ostroski, who told him Merck's decision regarding the senior specialist position was not yet final.

The morning after plaintiff sent Ostroski a copy of the letter to Covanta, she called plaintiff to thank him for clarifying the issue and offered him the senior specialist position at Merck. Plaintiff assumed the timing of the offer evidenced that Merck only agreed to hire him after learning he had not sued his prior employer for discrimination. Plaintiff requested the associate director

5

position instead, but Ostroski stated that his qualifications and experience level were "commensurate" with the senior specialist role. Plaintiff felt Ostroski's opinion conflicted with Gengos's statements to him during his interview for the senior specialist position.

On September 20, 2016, plaintiff accepted the Merck senior specialist position. Merck's prior employment verification process was completed without any issue regarding his Covanta employment being brought to plaintiff's attention. When plaintiff started working on October 24, 2016, it became immediately apparent to him that he was overqualified for the senior specialist position, which he viewed as an entry-level position below the associate director position he interviewed for and subordinate to the position he held at Covanta.

At the first team meeting held after plaintiff was hired, Kennedy warned the group collectively that gossiping was against company policy. Plaintiff construed this warning, together with the totality of the circumstances, as an indication that co-workers were aware of his alleged claim against Covanta and had been gossiping about it. There is no evidence in the motion record of any specific statements made by co-workers discussing any claim plaintiff filed against Covanta.

Plaintiff contends that immediately upon commencing employment with Merck, he was subjected to "a hostile environment" through "body language,"

6

"hurtful comments," and "adverse actions." To this end, plaintiff contends senior members of Merck ended conversations when he approached and avoided being alone with him at Merck's holiday lunch. Plaintiff thought all of his superiors and co-workers were uncomfortable around him. He felt his manager, Raymond Hawryluk, acted anxiously in his presence and avoided making eye contact with him. Plaintiff states Hawryluk suggested more than once that he should move to another group within the company.

Plaintiff alleges some of his colleagues made the following hurtful comments which referenced a mistaken understanding he had received a large sum of money by suing Covanta and, therefore, he did not need to work hard at Merck:

> "Not everyone is a millionaire around here, Kedar.
> Some of us have to work."

> "If I were you, I would be chilling too."

> "Where are you going on vacation? London? Paris? I
> bet you can go anywhere you like."

Plaintiff claims Merck attempted to terminate his employment several times. Plaintiff describes one instance when he was slated to be laid off as part of alleged budget cuts while his team was simultaneously planning to hire someone for a more senior position. On another occasion, plaintiff's team attempted to set him up for termination by assigning him an important task the

evening before the project deadline. When he finished the task in a timely manner, his colleagues were visibly upset.

In November 2016, plaintiff asked to meet confidentially with Gengos and relayed to her that Covanta had provided unfavorable references mentioning litigation plaintiff filed against it in the summer of 2016. During this meeting, plaintiff asked Gengos if Merck had received this incorrect information in connection with Merck's employment verification process. Gengos replied that she was not aware of any such evidence but offered to communicate with HR about the issue and agreed to be discreet about her conversation with plaintiff. Plaintiff further requested that Gengos provide him with any such evidence she might receive as he contemplated possible future litigation against Covanta.

Plaintiff relayed the same information and request to Hawryluk during a conversation on January 17, 2017. According to plaintiff, Hawryluk stated he was aware that an issue regarding plaintiff's prior employment had arisen during Merck's employment verification process, but he denied knowing any specifics. Plaintiff interpreted Hawryluk's comment to mean that, as of January 2017, Merck was aware plaintiff had previously threatened litigation against Covanta and was again contemplating a lawsuit against his prior employer.

On January 23, 2017, Gengos emailed plaintiff after communicating with HR and advised him Merck had no information regarding any issues arising

during plaintiff's employment verification process. Plaintiff asserts this message contradicted what Hawryluk told him.

Plaintiff observed several co-workers visit the offices of Kennedy and Gengos wishing them good luck and asking them to stay in touch. Plaintiff took this to mean that Kennedy and Gengos were aware they were being imminently terminated in order to prevent Merck's HR team from speaking with them during an internal investigation. Plaintiff assumed this was because they had knowledge of misinformation provided by Covanta in connection with Merck's employment verification of him. Kennedy and Gengos were not terminated from Merck.

In February or March 2017, plaintiff heard Hawryluk speaking with Chris Feudo, an attorney representing Covanta, but he did not hear the context or specifics of the conversation. Nonetheless, plaintiff concluded that Covanta and Merck were both using the same attorney to jointly retaliate against him "based on his national origin and his threats of legal action to seek redress for Covanta's and Merck's violations of his civil rights."

Plaintiff discovered that between December 2016 and March 11, 2017, he received emails sent from his Merck email account to his personal account containing statements such as: "Don't do it," "I am sad," "You are not the doer, God is the doer," and "Yes, believe it or not I am talking to you." On March 13,

2017, plaintiff reported the emails to Hawryluk who asked the information technology (IT) team to investigate. The IT team was unable to determine any alternative source of the emails and closed the matter. Plaintiff felt the emails were unlawful retaliation sent by someone else to damage his reputation.

On March 14, 2017, plaintiff filed a written complaint with Hawryluk alleging retaliation and referencing the emails. When Hawryluk did not respond, plaintiff sent the same complaint to Gengos the next day. Plaintiff received no response from Gengos.

Plaintiff was scheduled to work remotely on March 16, 2017, but discovered his access to Merck's computer network had been terminated. Plaintiff reported the issue to Hawryluk and Gengos but did not receive an immediate response. Hawryluk instead asked plaintiff to attend an in-person meeting on March 17, 2017. Plaintiff feared he would be terminated at this meeting, so he sent an email to Merck's senior management asking that his position be given "whistleblower protection."

When plaintiff arrived for the meeting, he discovered his employee identification no longer provided him with access to the work site. Upon meeting with Merck representatives, Chris Nigro from HR and Edwin Rios from the IT team, plaintiff informed them his network and site access had both been

disrupted. Nigro advised this was done intentionally as a "precaution." Plaintiff assumed this meant Merck considered him a security threat.

During the March 17, 2017 meeting, Nigro asked plaintiff questions regarding the investigation into plaintiff's report of suspicious emails from his account, requested the name of his attorney, and asked for a copy of the letter he sent to Ostroski, which plaintiff advised he would provide. During the meeting, plaintiff stated he received similar suspicious emails on January 17, 2017 and that his Merck-issued cell phone was also missing. Nigro then asked plaintiff to see Merck's nurse due to concerns about his fitness for duty in light of plaintiff's written statement as well as verbal responses during the meeting.

Merck's nurse asked plaintiff a series of questions including whether he knew his name, the date, and the name of the current president. The nurse asked if plaintiff ever thought about bringing weapons to work or hurting his coworkers, which he denied. When asked if there was a source of stress in his life, plaintiff advised the nurse about the Covanta issue but also asserted his work performance was meeting expectations.

Nigro then instructed plaintiff to take his laptop home for the weekend and drop it off with Merck's IT team on Monday to be reviewed in connection with the investigation of the emails plaintiff received. Later that day, plaintiff received an email from Nigro confirming his requests for documents and other

11

information during the meeting and advising plaintiff he was on paid administrative leave until further notice. Nigro also requested that plaintiff refrain from contacting any of his co-workers because of the confidential nature of the investigation Merck was undertaking as to the emails he received.

Instead of providing the documents and information requested by Merck, on Saturday, March 18, 2017 plaintiff emailed Nigro stating "I have decided to resign. I will return my laptop on Monday." Plaintiff sent another email to Nigro on Sunday, March 19 stating:

> Please confirm receipt of my email below and let me know the next steps. The best way to reach me is via email at my personal account (copied on this email).
>
> I will drop off the laptop tomorrow. Please have your forensic team look at it and confirm that there has been no suspicious activity in any of my accounts since Friday. I will need this confirmation before my separation from Merck.
>
> Regards,
> Kedar

On Monday, March 20, Nigro sent a responding email confirming he was "in receipt of [plaintiff's] resignation email and that Merck has accepted [plaintiff's] resignation."

Later that day, plaintiff sent Nigro an email stating Nigro had misunderstood and that plaintiff had decided to resign but he wanted to set a potential resignation date after they met in person since he had "carryover

vacation days" he wanted to use, and he needed the results of the email investigation prior to the date of separation. Nigro responded: "We have set your resignation effective for Friday March 24. I have confirmed with your management that you will be paid out 3 vacation days (1 carryover and 2 accrued)." Nigro also confirmed that plaintiff would have the results of the IT investigation prior to his separation date.

On March 21, 2017, plaintiff sent an email to Nigro at 10:03 p.m. advising he reconsidered his decision and would like to continue his employment with Merck. Plaintiff sent another email to Nigro the morning of March 22 at 6:59 a.m. advising his decision over the weekend to resign was impetuous and he wanted to continue his employment after reflecting on the economic impact and discussing the issue with his spouse. Plaintiff also offered to withdraw his request for an investigation in exchange for being allowed to continue employment with Merck.

Plaintiff sent yet another email to Nigro at 8:19 a.m. the morning of March 22, 2017, advising he would consider any other position at Merck's Kenilworth location. At 10:34 a.m. plaintiff sent the email thread to Nigro's supervisor, Jane Palaia, asking for help with what he couched as a "very urgent matter." Receiving no response, plaintiff again emailed Nigro and Palaia stating he would stop by the office in person on March 23, to discuss the resignation. Nigro

13

replied via email that plaintiff was not to come to the office in person, as previously discussed, unless directed by HR or security. Nigro's email stated he would call plaintiff to discuss further.

As memorialized in several additional emails sent on March 22, 2017, Nigro tried to call plaintiff numerous times at the phone number plaintiff provided, but he did not answer. Plaintiff sent multiple emails to Nigro questioning the directive that he not come to the work site. Nigro advised plaintiff by email on the same date that Merck IT security concluded its investigation into plaintiff's claim of suspicious emails being sent from his Merck email account. According to IT, the emails were present in the "deleted" folder of plaintiff's user account, there was no indication of any intrusion or access to plaintiff's Merck email account and no other Merck account had access to send email from plaintiff's account.

Nigro advised in the same email that Merck had elected not to accept plaintiff's withdrawal of his resignation and had scheduled March 24, 2017 as the separation date. Plaintiff sent a responding email on the same date stating only: "Thank you for responding. I am sorry to hear that."

Plaintiff alleges Merck thereafter incorrectly informed potential future employers that he was terminated. Further, he contends the terminology of "PER" used on Merck's job verification report could be read to mean plaintiff

14

was terminated for performance reasons and this is affecting his ability to obtain another job in his field. Plaintiff is now working multiple jobs as a substitute teacher, a paraprofessional, and as an economics expert with Study.com, while also volunteering with a business mentoring organization.

Considering these facts, the trial court concluded on reconsideration that plaintiff had not established a prima facie case of unlawful retaliation against Merck under the LAD. In its March 29, 2022 written decision, the trial court accepted plaintiff's facts as true for purposes of the motion and found plaintiff had not shown he was engaged in LAD-protected activity that was known by Merck. The trial court also found plaintiff did not present any evidence that Merck's provided reasons for any employment action were pretextual. Specifically, the court found that plaintiff did not show that his complaints were improperly addressed or that Merck forced him to resign.

On appeal, plaintiff argues the court committed reversible error by finding he did not demonstrate any LAD-prohibited retaliation. Plaintiff more specifically asserts the trial court overlooked the following in making that determination: 1) plaintiff filed an internal complaint of national origin discrimination with Covanta of which Merck was aware at the time it rejected his application for the associate director position; 2) plaintiff put Merck on notice of his intention to file a lawsuit against Covanta; and 3) plaintiff filed an

internal complaint with Merck alleging unlawful retaliation immediately prior to its refusal to allow him to rescind his resignation. Plaintiff further asserts the trial court erred in finding there was no evidence Merck's defenses were pretextual excuses designed to obscure impermissible discrimination.

Merck submits on appeal that plaintiff cannot prevail on his unlawful retaliation claim under the LAD since he resigned voluntarily, and it was not unlawful for the employer to refuse to accept plaintiff's withdrawal of his resignation. Merck further asserts plaintiff's unlawful retaliation claim is not supported by any evidence and that its actions with respect to plaintiff were legitimate and not pretext for unlawful discrimination.

We broadly construe and apply the protections of the LAD to allow for the greatest available antidiscrimination impact. Richter v. Oakland Bd. of Educ., 246 N.J. 507, 537 (2021). "The LAD's worthy purpose is no less than eradication of '"the cancer of discrimination" in our society.'" Ibid. (quoting Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016) (quoting Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 115 (2010))). In a discrimination claim under the LAD, it is the plaintiff who bears the burden to establish a prima facie case. Victor v. State, 203 N.J. 383, 408 (2010). To succeed in proving a prima facie case, the evidentiary burden is "rather modest." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005) (quoting Marzano v. Computer Sci. Corp., 91

F.3d 497, 508 (3d Cir. 1996)).  It is sufficient that the plaintiff is able to "demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent – i.e., that discrimination could be a reason for the employer's action."  Ibid. (emphasis omitted) (quoting Marzano, 91 F.3d at 508).

> [T]he prima facie elements of a retaliation claim under the LAD requires plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence.
>
> [Victor, 203 N.J. at 409.]

To guide the liberal application of the LAD, New Jersey has adopted the "procedural burden-shifting methodology" set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Under this burden-shifting analysis,

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Meade v. Twp. of Livingston, 249 N.J. 310, 328 (2021) (quoting Henry v. N.J. Dep't of Hum. Servs., 204 N.J. 320, 331 (2010)).]

Given that claims under the LAD are to be interpreted broadly and the standard for summary judgment requires facts to be viewed in the light most favorable to the non-moving party, the trial court's task was not to determine the strength of the case, but rather if plaintiff's "allegations, if true, can establish that [defendant] violated the LAD." Beneduci v. Graham Curtin, P.A., 476 N.J. Super. 73, 82 (App. Div. 2023). "Rather than considering each incident in isolation, courts must consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate . . . .'" Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 607 (1993) (quoting Burns v. McGregor Elec. Indus. Inc., 955 F.2d 559, 564 (8th Cir. 1992)).

"[A] person engages in protected activity under the LAD when that person opposes any practice rendered unlawful under the LAD." Young v. Hobart W. Grp., 385 N.J. Super. 448, 466 (App. Div. 2005); see also Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990). Discrimination based upon national origin is specifically prohibited under the LAD. N.J.S.A. 10:5-12. Plaintiff's assertion that he is of Indian origin was not disputed in the motion record.

Plaintiff contends Merck retaliated against him because it was aware he had threatened to institute or had filed a claim against his former employer for

18

discrimination. We will accept for the purposes of this appeal, as it appears the trial court did, that such actions could constitute protected activity. However, a prima facie case of unlawful retaliation requires proof establishing the prospective or successor employer had knowledge of the discrimination complaint against the prior employer.

We do not disturb the trial court's finding, based upon the undisputed facts in the motion record, that plaintiff has not proffered any evidence establishing Merck representatives knew plaintiff's threatened litigation or claim against his prior employer, Covanta, was predicated on national origin discrimination. Merck did not conduct a background check or prior employment verification until after plaintiff was offered and accepted the senior specialist position. There is no evidence that Merck knew plaintiff was proceeding with a discrimination claim against Covanta before hiring him. The only information Covanta provided Merck during the prior employment verification process was that plaintiff was involuntarily terminated by Covanta for poor performance. Nonetheless, Merck did not seek to withdraw plaintiff's offer of employment after receiving this negative information.

Nor is there evidence Merck became aware of a threatened or actual claim against Covanta based upon national origin discrimination during the course of plaintiff's employment. Plaintiff asserted during his deposition he was the one

19

who told senior Merck executives that he was going to sue Covanta during conversations with Gengos in November 2016 and Hawryluk in January 2017. However, even assuming all of plaintiff's factual assertions are true, there is no evidence plaintiff ever relayed to Merck that his claim against Covanta was based upon discrimination. Instead, the motion record establishes plaintiff advised Merck generically he would be suing Covanta for providing unfavorable references to prospective employers.

We reject plaintiff's non-specific and unsupported assertion that an attorney representing both Merck and Covanta shared information about plaintiff's claim against Covanta with Hawryluk, his supervisor at Merck. Generalized comments regarding plaintiff's alleged wealth by his co-workers and his perception that others were awkward around him do not establish Merck was aware that he had complained to Covanta of national origin discrimination.

Nor is the remainder of the behavior alleged by plaintiff to have occurred before and during plaintiff's employment with Merck otherwise actionable under the LAD. See Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 25-26 (2002) (explaining that rude or uncivil behavior and "simple teasing, offhand" comments alone do not create a hostile work environment or constitute a claim for discrimination). The motion record is also devoid of any evidence Merck was aware of plaintiff's threatened or actual discrimination claim against

Covanta when accepting his resignation or rejecting plaintiff's attempt to rescind it.

We also reject any contention that there is prima facie evidence of adverse employment action in the record. Plaintiff does not argue constructive discharge. Nor is there any other adverse employment action by way of loss of salary alleged. Plaintiff's argument that Merck took adverse employment action against him by terminating his employment in retaliation for engaging in protected activity under the LAD is belied by plaintiff's voluntary resignation.

Plaintiff asserts he did not tender his resignation, but instead argues he intended to resign at some future point. Plaintiff's contention is contradicted by the language of his own resignation and subsequent emails confirming the resignation, followed by an attempt to rescind, after reflection on the economic and marital impact of his decision.

We agree the uncontroverted facts in the record establish Merck had legitimate, non-discriminatory reasons for its decisions and plaintiff offered no evidence of pretext. Under the burden-shifting methodology set forth in McDonnell-Douglas, plaintiff must establish Merck's legitimate reasons for its actions were merely pretextual excuses to shroud underlying discrimination. 411 U.S. at 802-04. Plaintiff has not met this burden and summary judgment was appropriately granted.

21

"To prove pretext . . . a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent." Viscik v. Fowler Equip. Co., 173 N.J. 1, 14 (2002). Plaintiff argues in generalities that the trial court improperly found he failed to raise an issue as to pretext by asserting: 1) Merck's "proffered reasons for refusing to accept [plaintiff]'s request to rescind his resignation were inconsistent, implausible, and not worthy of credence"; 2) the "temporal proximity" between the "protected activity and the adverse employment action" demonstrates a nexus; and 3) plaintiff was "subjected to significant ongoing antagonism" due to his protected activities. However, plaintiff has failed to point to any evidence in the motion record to support these broad assertions.

Nor has plaintiff established any Merck representative took any employment action against him based on a discriminatory intent. The motion record establishes Merck used an internal process to determine plaintiff was appropriate for the senior specialist position, rather than the associate director job which was based in part on his performance during the interview.

Plaintiff's unlawful termination claim is predicated in part on Merck's refusal to continue plaintiff's employment despite the post-acceptance withdrawal of his resignation. Plaintiff does not supply any statute or case law

22

demonstrating a private employer is required to reinstate at-will employment after an employee attempts to rescind their resignation.

> An employer who accepts an unequivocal notice of resignation from an employee is entitled to rely upon it, to the extent of preparing in one manner or another for the employee's absence, unless, of course, the employer chooses to return to status quo by rehiring the employee, or accepting a retraction of the notice.
>
> [Nicholas v. Bd. of Rev., Dep't of Labor & Indus., 171 N.J. Super. 36, 38 (App. Div. 1979) (quoting Guy Gannett Pub. Co. v. Me. Emp. Sec. Comm'n, 317 A.2d 183 (Me. 1974)).]

"Absent a contract providing otherwise, employment in New Jersey is at-will." Lapidoth v. Telcordia Techs., Inc., 420 N.J. Super. 411, 420-21 (App. Div. 2011). An employer of an at-will employee has the unfettered right to continue or cease employment for any reason or no reason at all, so long as the actions do not violate the LAD. Id. at 421. Likewise, though an employer of an at-will employee does not have to accept the rescission or retraction of a resignation, the refusal cannot be predicated on a discriminatory intent. See Prager v. Joyce Honda, Inc., 447 N.J. Super. 124 (App. Div. 2016).

Thus, as an at-will employee, plaintiff had the right to resign and Merck had the corollary right to accept plaintiff's resignation and refuse to allow him to reinstate his own employment by withdrawing the resignation, subject to the LAD. Bernard v. IMI Sys., Inc., 131 N.J. 91, 105-06 (1993). We find no

evidence in the record that Merck's refusal to accept plaintiff's withdrawal of his resignation was improperly motivated by a discriminatory intent.

The undisputed facts in the record establish that plaintiff's statements in a memorandum and the subsequent interview on March 17, 2017, constituted legitimate, non-discriminatory reasons for requiring a medical evaluation to determine plaintiff's fitness for continued employment at Merck and to place him on paid administrative leave. Merck's assertion that it was investigating all of plaintiff's claims when he voluntarily resigned is also unrebutted and is supported by the record. Further investigation of plaintiff's claims of suspicious emails established they were sent by plaintiff's computer to which no other Merck employee had access.

Thus, under McDonnell-Douglas, the burden shifted to plaintiff to show that the rationale underpinning Merck's employment decisions was not legitimate and, instead, was merely pretextual. Plaintiff did not offer any evidence as to why Merck's explanations were merely pretext and, instead, were taken in furtherance of an unlawful discriminatory intent.

The competent evidential materials in the motion record also do not establish a prima facie unlawful retaliation claim under the LAD for any post-employment actions taken by Merck. Plaintiff's claim that Merck incorrectly advised subsequent prospective employers he had been terminated is not

24

supported by the motion record. Plaintiff alleges the report that Merck provided to potential future employers upon request displays a separation code of "TER," which plaintiff claims equates to a proclamation that he was terminated, and a separation description of "PER," which plaintiff argues could be interpreted as performance-related. Not only is the record devoid of any proofs as to the meaning of the codes on the report beyond plaintiff's speculation, but plaintiff has failed to supply any evidence that his job search has been hindered by dissemination of the report beyond his own unsupported conjecture.

To the extent we have not addressed any of plaintiff's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION